PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
LAW OFFICES OF PAMELA Y. PRICE
A Professional Corporation
901 Clay Street
Oakland, CA  94607
Telephone:  (510) 452-0292
Facsimile:    (510) 452-5625
E-Mail: pamela.price@pypesq.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DMC CLOSURE AVERSION COMMITTEE (DCAC), BRAZELL H. CARTER, OTIS E. ROUNDS, HUMAYUN TUFAIL, ELLEN C. MORRISSEY, KAREN BOLDEN, GEORGE "TOMMIE" THOMPSON, CURTIS HUNTER, BETTY J. RODGERS AND MARIA D. VALLEJO, INDIVIDUALLY AND ON BEHALF OF ALL PERSONS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN GOIA, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CONTRA COSTA COUNTY SUPERVISOR FOR DISTRICT 1, ERIC ZELL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE PRESIDENT OF THE WEST CONTRA COSTA HEALTH CARE DISTRICT, WILLIAM WALKER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS THE HEALTH SERVICES DIRECTOR FOR CONTRA COSTA COUNTY, CANDACE ANDERSON, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS CONTRA COSTA COUNTY SUPERVISOR FOR DISTRICT 2, MARY PIEPHO, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS CONTRA COSTA COUNTY SUPERVISOR FOR DISTRICT 3, KAREN MICHOFF, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS CONTRA COSTA COUNTY SUPERVISOR FOR DISTRICT 4, FEDERAL GLOVER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CONTRA COSTA COUNTY SUPERVISOR FOR DISTRICT 5, COUNTY OF CONTRA COSTA, AND THE WEST CONTRA COSTA HEALTH CARE DISTRICT, <br><br> Defendants. | NO.  C14-03636 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR TEMPORARY RESTRAINING ORDER (TRO) AND PRELIMINARY INJUNCTION** <br><br> DATE:       AUGUST 11, 2014 <br> TIME:        TBD <br> CTRM:       TBD |

1

## TABLE OF CONTENTS

2   **Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **i**

3   **Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ii**

4   **Notice of Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

5   **Memorandum of Points And Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

6   **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

7   **Statement of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

8              **A.      Doctors Medical Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

9              **B.      The Plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

10                      **1.    Plaintiff Betty Rodgers** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

11                      **2.    Plaintiff Karen Bolden** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

12                      **3.    Plaintiff Brazell H. Carter, M.D.** . . . . . . . . . . . . . . . . . . . . **6**

13                      **4.    Plaintiff Ellen C. Morrissey** . . . . . . . . . . . . . . . . . . . . . . . **7**

14                      **5.    Plaintiff Humayun Tufail, M.D.** . . . . . . . . . . . . . . . . . . . . **7**

15                      **6.    Plaintiff Otis E. Rounds, M.D.** . . . . . . . . . . . . . . . . . . . . . **7**

16                      **7.    Plaintiff Curtis Hunter** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

17                      **8.    Plaintiff Maria D. Vallejo** . . . . . . . . . . . . . . . . . . . . . . . . . **8**

18                      **9.    Plaintiff George "Tommie: Thompson** . . . . . . . . . . . . . . . . . **8**

19              **C.      Characteristics of the Class** . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

20

21   **I.       The Legal Standard for Issuing A Temporary Restraining Order** . . . . . . . . **10**

22   **II.      Plaintiffs Are Likely To Succeed On the Merits of Their Claims** . . . . . . . . . **10**

23              **A.      Eliminating Services at DMC Violates Title VI of the Civil Rights Act of 1964** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

24              **B.      Eliminating Services at DMC Has A Disparate Impact on African-Americans and Violates Section 1135 of the California Government Code** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

25

26              **C.      Eliminating Services at DMC Violates the Americans with Disabilities Act** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

27

28

D.      Eliminating Services at DMC Violates the Age Discrimination Act of 1975 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

E.      Eliminating Services at DMC Violates the Medicaid Act   . . . . . . 16

F.      Eliminating Services at DMC Violates California Welfare & Institutions Code   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

G.      Defendants WCCHD and CCC Did Not Provide the Required Health & Safety Code Notice of Reduction of Emergency Medical Services   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.    Plaintiffs Will Suffer Irreparable Harm In the Absence of A TRO and Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.     The Balance of Equities Tips In Plaintiffs' Favor  . . . . . . . . . . . . . . . . . . . . 18

V.      A TRO And Preliminary Injunction Are In the Public Interest  . . . . . . . . . . 10

VI.     Plaintiffs Should Not Be Required to Post Bond  . . . . . . . . . . . . . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...................................... 10

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..................... 10

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) 11

*Benda v. Grand Lodge of International Associate of Machinists and Aerospace Workers*, 584 F.2d 308 (9th Cir. 1978) ................................. 10

*Briggs v. Sullivan*, 886 F.2d 1132 (9th Cir. 1989) ........................................... 10

*Darensburg v. Metropolitan Transport Com'n*, 636 F.3d 511 (9th Cir. 2011) ............. 11

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012) ........................................... 10

*Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997) ......................................... 12

*Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993) ............................................. 13

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) ........................................... 12

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir.), 463 U.S. 1328 (1983) ........................... 19

*Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) ..................................... 19

*Orantes-Hernandez v. Smith*, 541 F.Supp. 351 (C.D.Cal. 1982) ................................ 19

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, *modified on other grounds*, 775 F.2d 998 (9th Cir. 1985) ...................................... 19

*Rannels v. Hargrove*, 731 F. Supp. 1214 (E.D. Pa. 1990) ............................................ 15

*Rodde v. Los Angeles*, 357 F.3d 988 (9th Cir. 2003) ....................................... 14

*Schweiker v. Gray Panthers*, 453 U.S. 34 (1981) ........................................... 16

*The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) ........................................ 13

*Walker v. County of Santa Clara*, 2011 WL 4344212 (N.D. Cal. 2011) ................... 10

*Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990)                                   16

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ................................. 10

## STATE CASES

*County of San Diego v. State of California*, 15 Cal.4th 68 (1997) ................................. 17

*Gardner v. County of Los Angeles*, 34 Cal.App.4th 200 (1995) ................................... 17

*Mooney v. Pickett*, 4 Cal.3d 669 (1971) ................................................................. 17

## FEDERAL STATUTES

U.S.  Constitution, Title VI ...................................................................................... 1

42 C.F.R. § 438.206(b)(1)(v) .................................................................................. 16

   42 C.F.R. §438.207(b)(2) .................................................................................... 16

42 C.F.R. § 447.204 ................................................................................................ 16

42 U.S.C. § 1396(a)(30)(A) .................................................................................... 16

42 U.S.C. § 1396a(a)(8); ......................................................................................... 16

42 C.F.R. § 435.930 ................................................................................................ 16

42 U.S.C. § 2000d ................................................................................................... 10

42 U.S.C. 6101 et seq ............................................................................................. 15

45 C.F.R. §1181.103 ............................................................................................... 14

29 U.S.C. §12132 ................................................................................................... 13

42 U.S.C. §§12131-12134 ...................................................................................... 13

## STATE STATUTES

Cal. Code Regs, Tit. 16, § 1443.5(6) ....................................................................... 9

Cal. Code Regs, Tit. 22, § 53885(a) ....................................................................... 16

-iv-
TABLE OF AUTHORITIES

**Cal. Code Regs, Tit. 22, §9810(1)** ............................................................ **12**

**Cal. Health & Safety Code Section 1255.1(a)** ........................................ **2, 17**

**Cal. Health & Safety Code, Section 11135** ............................................... **2**

**Cal. Welf. & Inst. Code § 14000** ............................................................ **16**

**Cal. Welf. & Inst. Code § 17000** ......................................................... **3, 17**

**Cal. Gov. Code. §11135(a)** ..................................................................... **12**

**Cal. Gov't Code Section 51 et seq** .......................................................... **2**

**Prof. Code § 2725(b)(4)** ........................................................................ **9**

TABLE OF AUTHORITIES

**TO:    DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** of a hearing at a date and time to be determined by the Court as soon as counsel may be heard in the above-entitled Court, Plaintiffs will move the Court for a Temporary Restraining Order to stop the closure of and/or illegal reduction in services of Doctor's Medical Center (DMC) on the grounds that thousands of people, primarily seniors, African-Americans and disabled residents of Contra Costa County will suffer irreparable harm, up to and including death, if Defendants are permitted to continue their reckless decision-making of DMC.

This Motion will be based on this Notice, the Memorandum of Points and Authorities, the Declarations of Dr. Brazell H. Carter, M.D., Dr. Otis E. Rounds, M.D., Dr. Ellen Morrissey, M.D., Dr. Sharon D. Drager, M.D., Dr. Humayun Tufail, M.D., Karen Bolden, George "Tommie" Thompson, Curtis Hunter, Maria D. Vallejo, Betty J. Rodgers, Seung Choo, Carol Sims and Charlene Arrington, all filed and served concurrently herewith, and upon such other and further matters as may be considered by the Court at the time of the hearing.

<u>**Memorandum of Points And Authorities**</u>

<u>**Introduction**</u>

Rarely is a court asked to issue a temporary restraining order and preliminary injunction that, if not granted, will have life and death consequences.  Unless this Court acts quickly, Doctors Medical Center (DMC) will begin to reduce critical patient services on August 12, 2014, with what Defendant Contra Costa County (CCC) has acknowledged will be "catastrophic consequences" for residents served by DMC.  Defendant Contra Costa County and DMC (owned and operated by Defendant West Contra Costa Healthcare District) announced on August 1, 2014, that DMC will close its STEMI Cardiac Unit, divert ambulances from its Emergency Department, and cap inpatient beds to a maximum of 50, beginning on August 12, 2014, without the 90 days notice required under California law.

The health and very lives of residents of West Contra Costa County, many of them indigent and suffering from disabilities and disproportionately African-Americans and senior citizens hang in the balance.  By these actions, Defendants violate the 14th Amendment to the U.S.

Constitution, Title VI of the Civil Rights Act of 1964 with regard to African-Americans, the Age Discrimination Act of 1975 with regard to senior citizens, the Americans with Disabilities Act with regard to disabled individuals, the Medicaid Act, Section 1983 of Section 42 of the U.S. Code, Section 1255.1 of the Cal. Health & Safety Code, Section 11135 of the Cal. Gov't Code, and Section 51 et seq. of the Cal. Civ. Code.

For these reasons, Plaintiffs and class members bring this ex-parte motion seeking a temporary restraining order (TRO) and Order to Show Cause (OSC) regarding a preliminary injunction, to prevent defendants from closing the STEMI Cardiac Unit, diverting ambulances from its Emergency Department, and imposing a cap on inpatient beds to a maximum of 50, beginning on August 12, 2014.

## Statement of Facts

### A.     Doctors Medical Center

Doctors Medical Center is one of only two hospitals in West Contra Costa County (West County).  It is geographically isolated from the rest of Contra Costa County. [Exh. 1 to Complaint] As stated in Defendant CCC's June 13, 2014 "Impact Evaluation Report:  Doctors Medical Center San Pablo Potential Closure of Emergency Services," "[t]he principal traffic corridor through western Contra Costa County is the heavily traveled and frequently congested Interstate 80 extending 16 miles through Contra Costa County. . . . In 2013, DMC had 171 active staffed beds," and "the Emergency Department (ED) served 41,903 individuals with 29% meeting criteria for severe or critical conditions." DMC is the only hospital in the West County with a STEMI (ST-Elevated Myocardial Infarction) Center.  *Id.*

DMC serves a community in West County with elevated rates of chronic, life-threatening health problems, notably heart disease, diabetes, cancer, as well as child and adult asthma.  (See Declarations of Otis E. Rounds at 2:13-3:2; Declaration of Ellen C. Morrissey at 2:16-23; Declaration of Brazell H. Carter at 3:2-3, all filed concurrently herewith.)  The community served by DMC is largely African-American (34.65 percent of 2013 discharges) and people aged 60 or older (61.6 percent of 2013 discharges) [Exh. 3 to Complaint]

DMC is owned and operated by Defendant WCCHD.  [Exh. 1 to Complaint] Defendant

1   CCC operates a comprehensive health system that provides integrated health services to residents

2   of Contra Costa County, in the West County through Defendant WCCHD, in furtherance of its

3   duty under Cal. Welf. & Inst. Code § 17000 to relieve and support incompetent, poor and indigent

4   residents of Contra Costa County who are incapacitated by age, disease, or accident, and lack of

5   insurance or other health care resources.  Cognizant of this duty to West County residents,

6   Defendant CCC created a "Joint Powers Authority" on February 6, 2007, to provide management

7   oversight of DMC for the benefit of the communities that both Contra Costa County and the West

8   Contra Costa Healthcare District serve, in order to facilitate Contra Costa County's statutory

9   obligation under Cal. Welf. & Inst. Code § 17000. [Exh. 4 to Complaint]

10          The Joint Powers Authority terminated by agreement of Defendants CCC and WCCHD in

11   2011. Under the Termination Agreement, however, Defendant CCC retained a significant role on

12   the Governing Body of Defendant WCCHD. [Exh. 5 to Complaint] Defendant WCCHD's

13   Governing Body is comprised of a  Board of Directors  with eleven members, which contains

14   significant representation of Defendant CCC, most notably: Dr. William Walker, the executive

15   director of Contra Costa Health Services  Department;  Pat Godley, the Chief Financial Officer of

16   Contra Costa Health Services; and  Dr. Wendel Brunner, a Contra Costa Health Services

17   executive.  Five members of the Governing Body Board are the elected members of the West

18   Contra Costa Healthcare District: Eric Zell, Chair; Irma Anderson, RN; Deborah Campbell, RN;

19   Beverly Wallace; and Nancy Casazza, RN. Two members of the Board are representatives of the

20   DMC Medical Staff: Dr. Sharon Drager and Dr. Richard Stern.

21          DMC is a continuing joint venture of Defendants CCC and WCCHD.  Operations were

22   funded in part by Defendant CCC during the period of 2007 through 2011 through the Joint

23   Powers Agreement between the County and the District [Exh. 6 to Complaint].  JPA funding was

24   terminated based on the assumption it was no longer critical to continuing operations of the joint

25   venture.  Since 2011 and continuing, however, the DMC joint venture has operated under with the

26   authority of a Governing Board consisting of District and County representatives.  Through its

27   obligations and authority under the terms of the joint venture, and in consideration of its public

28   health obligations generally, and its unquestionable financial ability to ensure continuing viability

1  and operations of the DMC joint venture, the County has an obligation to provide necessary

2  support and funding for continuing DMC operations. [Exh. 7 to Complaint]

3      In furtherance of its duty to relieve and support incompetent, poor and indigent residents

4  *outside of* West County, Contra Costa County, through Contra Costa Health Services, operates a

5  full service acute care hospital, Contra Costa County Regional Medical Center (the County

6  Regional Medical Center), located in Martinez, California. African-Americans made up only

7  15.15 percent of discharges at CCRMC, and people aged sixty or older made up only 19.11

8  percent of hospital discharges at CCRMC in 2013. [Exh. 3 to Complaint]

9      Defendant CCC's Emergency Medical Services Division announced in a press release

10  dated August 1, 2014, that it will close DMC's STEMI Cardiac Unit, divert ambulances from its

11  ED and cap inpatient beds to a maximum of 50, beginning on August 12, 2014, without the 90

12  days notice required under California law. [Exh. 2 to Complaint]

13      As Defendant CCC has publicly acknowledged 1) "The loss of DMC would be catastrophic

14  to West Contra Costa County; it is one of only two hospitals in the region; 2) DMC represents 79

15  percent of the inpatient capacity in the region; 3) DMC provides 59 percent of the ED (Emergency

16  Department) care in the region; 4) DMC receives 62 percent of the regional ambulance traffic; 5)

17  The remaining West County hospital would be inundated by this patient volume shift as DMC

18  patients would need to go somewhere; 6) The remaining hospital is part of Kaiser and the general

19  public typically perceives it as unavailable to non-Kaiser members; 7) The region already does not

20  have enough needed ED treatment stations or ICU beds even with DMC; 8) West County ED

21  waiting times will likely reach 10-12 hours; 9) Additional ambulance hours needed to maintain

22  current EMS performance would cost $2.5M annually; [and] 10) Critical infrastructure would be

23  eliminated to support a disaster." The diversion of ambulance service from DMC will also cause

24  much longer patient transports (15 to 27 minutes longer cross county and multi-county).

25      In addition, as Defendant CCC has acknowledged, DMC provides 25 percent of the STEMI

26  care in the County. Patient outcomes would be threatened and longer lengths of stay expected due

27  to the resulting delays in arranging for intra-facility transfer or transporting patients to more

28  distant STEMI centers. This critical asset would be a substantial loss to the healthcare system.

1   Defendant CCC's June 13, 2014 "Impact Evaluation Report adds that "DMC is a designated

2   primary stroke center serving 50% of West County stroke patients," and "[i]n the event of a

3   closure the closest STEMI receiving center is 15-27 minutes away by ground.  These longer

4   transport times do not account for traffic which can add another 20 to 30 minutes of delay to

5   definitive care during peak commute hours." [Exh. 1 to Complaint]

6       Patients with circulatory system diagnoses represented 25.14 percent of DMC's inpatient

7   discharges in 2013 based on data from the Office of Statewide Planning and Development. [Exh.

8   1 to Complaint; see also Declaration of Sharon B. Drager at 2:9-14.]

9       **B.    The Plaintiffs**

10          **1.    Plaintiff Betty Rodgers**

11      Representative plaintiff Betty Rodgers is a 58 year-old African-American individual, who

12  receives Medi-Cal and Medicare because of her medical conditions and disabilities. DMC

13  provides the emergency and specialized care that she depends on.  Ms. Rodgers has a number of

14  chronic life threatening conditions. She suffers from congestive heart failure, a chronic and

15  degenerative disease that greatly increases her risk for sudden heart attack or stroke. Ms. Rodgers

16  also suffers from Chronic Obstructive Pulmonary Disorder (COPD), a degenerative lung disease,

17  as well as asthma, which requires daily treatment. In addition, Ms. Rodgers has high blood

18  pressure and Stage 3 kidney failure.

19      These health conditions severely impact and restrict many activities of Ms. Rodgers' daily

20  living, like walking, standing, driving, household chores, recreation, and work. She cannot work

21  and is confined to a mobility chair and cannot travel great distances. If Ms. Rodgers must travel

22  beyond the range of her chair, she must use public transportation, since it is not safe for her to

23  drive and she does not have a vehicle capable of transporting her chair.

24      Ms. Rodgers depends on DMC for life-saving, emergency medical treatment of her health

25  conditions. The hospital is half a mile from her home, and when her health permits, she is able to

26  use her mobility chair to travel to the facility for care. Since January 2014, Ms. Rodgers has been

27  transported to DMC five or six times because of medical emergencies. Several months ago she

28  was transported by ambulance to DMC while experiencing heart attack symptoms. The specially

trained physicians, nurses, and other medical personnel were able to diagnose her within minutes of her arrival and saved her life. She was transported to DMC most recently in early July 2014, when she received a diagnosis of Stage 3 kidney failure. Ms. Rodgers' kidney failure places even more stress on her heart and lungs, greatly increasing the risk of suffering a crippling stroke or deadly heart attack.

### 2.    Plaintiff Karen Bolden

Karen Bolden is a Registered Nurse (RN) who works at DMC.  She has been employed at DMC for 37 years.  RN Bolden is an African-American woman, residing in Pinole, California, and is a survivor of breast, bone, lung and brain cancer, having been treated for all of her illnesses primarily at DMC.

With her 21 years of experience in the Intensive Care Unit (ICU) and 13 years of experience in case management, RN Bolden is aware that patients will be put at an increased risk of death or disability without a certified STEMI center with access to the types of services and medications provided there.  When DMC reduced beds to 50 as a temporary measure on or about August 5, 2014, in advance of the permanent reduction announced for August 12, 2014, Bolden made arrangements for patients, who had been waiting as long as 20 hours, to be transported to other facilities.

From her Registered Nurse experience, RN Bolden is aware that the diversion of ambulance service from DMC could "easily result in death or disability."  Based on her experience as an RN, Bolden believes that her 92 year-old mother, who lives in Richmond, California, and is a former heart attack patient treated at DMC, could not survive a ride from Richmond to Martinez or Berkeley, where the nearest facilities for heart attacks are located.  [Bolden Decl. at 3:2-8.]

### 3.    Plaintiff Brazell H. Carter, M.D.

Representative Plaintiff Dr. Brazell H. Carter is a board-certified doctor of internal medicine whose practice focuses on geriatric patients served by DMC.  Dr. Carter has been practicing internal medicine in West County and affiliated with DMC for thirty-five (35) years. He is a graduate of Meharry Medical College and San Francisco State University.  He is familiar with the skilled nursing facilities in the area which account for more than 1,500 beds, occupied

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY RESTRAINING ORDER

primarily by seniors or disabled persons. Dr. Carter's patients suffer from numerous chronic and life-threatening health conditions, including heart failure, diabetes, and strokes. During the last major diversion initiated by DMC ten (10) years ago, Dr. Carter actually lost an elderly patient who was shuffled around and ultimately shipped out to Stanford Hospital due to the lack of beds in the area. The gentleman died on the way to Stanford Hospital. [Carter Decl. at 2:22-32.]

### 4. Plaintiff Ellen C. Morrissey, M.D.

Representative Plaintiff Dr. Ellen Morrissey, MD, is a board-certified nephrologist whose practice focuses on patients served by DMC. She has been affiliated with DMC for twenty-six (26) years. Dr. Morrissey was previously the Chief of Staff for DMC and is therefore familiar with the operation of the hospital and its patient population. Dr. Morrissey's patients suffer from numerous chronic and life-threatening health conditions, including kidney failure, diabetes, and leg amputations. Most of Dr. Morrissey's patients have already lost most kidney function and consequently suffer from multiple organ problems. DMC provides life-saving support to hundreds of dialysis patients every week. [Morrissey Decl. at 2:16-23.] Limiting access to DMC for those patients in the face of a risk that they may need acute care is simply unconscionable.

### 5. Plaintiff Humayun Tufail, M.D.

Representative Plaintiff Dr. Humayun Tufail, MD, chose to come to work at DMC because he felt that the community would show its appreciation for his efforts and he could make a difference in the community. As a Hospitalist focusing on emergency medicine, Dr. Tufail is acutely aware that "time is muscle" and DMC is one of the few medical facilities in the Bay Area with a fully functioning STEMI. The importance of this asset cannot be overstated in improving the life-saving power of the doctors and nurses.

### 6. Plaintiff Otis E. Rounds, M.D.

Representative Plaintiff Dr. Otis E. Rounds is totally committed to the survival of DMC because it is so critical to the survival of the community it serves. He also regularly treats patients with acute MI and/or strokes. He has observed that DMC patients have higher rates chronic illnesses, including complications of diabetes, COPD, cardiac disease, congestive heart failure and valvular abnormalities. Many of his patients do not have cars and have to rely upon public

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY RESTRAINING ORDER

transportation, even in case of an emergency.  [Rounds Declaration at 2:23-27.]

### 7.   Plaintiff Curtis Hunter

Representative Plaintiff Curtis Hunter is a young African-American man recently and unexpectedly diagnosed with germ cell cancer.  He was initially diagnosed at DMC but referred out to the County Hospital in Martinez because of the turmoil at DMC.  As a result of the reduction in services he must now transverse the mountains across Highway 4 in the event of an emergency as well as to obtain his regular treatments.  He has been hospitalized three times in the first few months of his illness with chest pains and difficulty breathing.  [Hunter Decl. at 2:8-17.] His condition is quite serious and he is being deprived of reasonable and prompt access to medical services.

### 8.   Plaintiff Maria D. Vallejo

Representative Plaintiff Maria D. Vallejo is a single Mom with two children who works and is not eligible for Medi-Cal.  She is uninsured and suffers from high blood sugar.  She lives within walking distance of DMC and she is terrified that closing the Emergency Room department will place her life at risk.  She has no idea how to get to another public or private hospital. [Vallejo Decl. at 2:8-16.]

### 9.   Plaintiff George "Tommie" Thompson

Representative Plaintiff George "Tommie" Thompson is an 81-year senior who suffers from the same characteristic illnesses common amongst African-Americans and seniors in West County:  diabetes and high blood pressure.  He lives near DMC and his ability to get to a distant facility in an emergency is complicated by the fact that his wife does not drive.  [Thompson Decl. at 2:18-24.]  In his words, closing the Emergency Department at DMC is "a death warrant" for him and other seniors with chronic life-threatening health conditions.  [Thompson Decl. at 2:8-12.]

### C.   Characteristics of the Class

The numerous patients with disabilities who reside in the West Contra Costa community served by the Defendants are similarly situated to Betty Rodgers, and Curtis Hunter, as they are

persons with severe medical conditions who require the use of a STEMI Cardiac Unit and ambulance transport services and a sufficient number of inpatient beds to save their lives.

Additionally, as African-Americans, Rodgers, Thompson, Bolden and Hunter fairly represent the class of persons who will be discriminatorily targeted by the Defendants' threatened termination of critical services at DMC.  As a senior and the caretaker of senior patients, respectively, Thompson and Dr. Carter are well-suited as class representatives.

The numerous patients in the West Contra Costa community who suffer chronic health conditions, poverty, frailty due to advanced age, and live with disabilities are well represented by Drs. Carter, Tufail, Rounds and Morrissey, because their professional duties as physicians and members of the DMC medical staff require them to advocate for these disadvantaged populations. Additionally, as longtime members of the medical community, these physicians are well able to represent the interests of the people of color whom the Defendants have a fiduciary duty to serve and who will be disproportionately affected by the threatened termination of critical services at DMC.

As registered nurses licensed in California, Bolden and her colleague Nurses at DMC ("the Nurses") are clinical professionals with their own unique scope of practice and duty. (Bus. & Prof. Code § 2725(b)(4).) The regulations defining a registered nurse's unique professional responsibility require him or her to "[a]ct as the [patient's] advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests or wishes of the [patient], and by giving the [patient] the opportunity to make informed decisions about health care before it is provided."  (Cal. Code Regs, tit. 16, § 1443.5(6).  A failure to provide critical care can constitute a breach of the duty of patient advocacy and subject a registered nurse's license to discipline. Therefore, in addition to jeopardizing their health and the community's, the Defendants' threat to terminate critical care services undermines the ability of the Nurses to comply with the fundamental mandates of their professional license.

Faced with the clear and present threat of imminent cessation of all healthcare for a substantial number of West County patients, the Nurses are not only professionally authorized to undertake this action to vindicate their community's fundamental right to life, but Nurses are also

professionally obligated to engage in every one of the collective actions that justly offer their

patients any hope for effective relief from this impending health catastrophe.

## I.   THE LEGAL STANDARD FOR ISSUING A TEMPORARY RESTRAINING ORDER

The standard for issuing a TRO is the same as that for issuing a preliminary injunction. *Walker v. County of Santa Clara*, 2011 WL 4344212 at *2 (N.D. Cal. 2011). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). If plaintiffs show a "likelihood of irreparable injury and that the injunction is in the public interest," a "preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *accord, Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). Thus, in cases such as this where the balance of hardships tips decidedly towards the plaintiffs, "then the plaintiff need not show as robust a likelihood of success on the merits," *Benda v. Grand Lodge of International Assoc. of Machinists and Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978), and may be granted an injunction "even though the questions raised are only serious enough to require litigation."  *Briggs v. Sullivan*, 886 F.2d 1132, 1143 (9th Cir. 1989).

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   Eliminating Services at DMC Violates Title VI of the Civil Rights Act of 1964.

Title VI of the Civil Rights Act of 1964 provides at Section 601 that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  42 U.S.C. § 2000d.

In *Alexander v. Sandoval,* 532 U.S. 275, 279 (2001), the Court made clear that "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." The Court clarified that Title VI prohibits intentional discrimination and that its precedent never allowed a private right of action concerning allegations of disparate impact. *Id.* at 280.  In proving

intentional discrimination, however, the Court in *Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977) also made clear that:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare. . . impact alone is not determinative, and the Court must look to other evidence.

Here there is such evidence.  Defendants CCC, WCCHD, and Defendants Goia, Walker, Piepho, Michoff, Glover and Anderson cannot deny that they are aware of the State's demographic data as to the population served by DMC, as compared to CCRMC.  DMC treats substantially more African-Americans and senior citizens than CCRMC does.

While such an argument to prove purposeful discrimination was rejected by the Ninth Circuit in *Darensburg v. Metropolitan Transp. Com'n,* 636 F.3d 511 (9th Cir. 2011), this was because the failure of plaintiffs' there to establish that the defendant's challenged conduct had a discriminatory impact prevented the inference of intentional discrimination, where plaintiffs attempted "to draw equivalences between (1) bus-riders and minorities, and (2) rail-riders and whites." *Id.* at 522.

Here, no attempt to draw such equivalencies is necessary.  Actual data from the State of California clearly displays the demographic disparity between the patients served by DMC and CCRMC.  The community served by DMC is largely African-American.  Based on data from the Office of Statewide Planning & Development, in 2013 African-Americans accounted for 34.65 percent of Hospital Inpatient Discharges and 36.66 percent of Emergency Department Encounters at DMC.  By contrast 52.45 percent of CCRMC Inpatient Discharges in 2013 were White and only 15.15 percent were Black. Whites also comprised 40.77 percent of Emergency Department Encounters at CCRMC in 2013, while African-Americans accounted for only 16.08 percent.  Similarly, the community served by DMC is predominantly senior citizens.  Patients aged 60 or older accounted for 61.6 percent of Hospital Inpatient Discharges and 17.47 percent of Emergency Department Encounters at DMC in 2013, while only 19.11 percent of Hospital Inpatient

1  Discharges and 11.62 percent of Emergency Department Encounters at CCRMC were patients

2  aged 60 or older.  [Exh. 3 of Application and Complaint]

3      Defendants are acting with full knowledge of the demographic populations served by

4  DMC and the devastating consequences which Defendant CCC itself has documented that will

5  result from closing the DMC STEMI Cardiac Unit, diverting ambulances from DMC's Emergency

6  Department, and capping DMC's inpatient beds to a maximum of 50, beginning on August 12,

7  2014.  Defendant CCC is a continuing joint venture with the Defendant WCCHD, as it financially

8  supported it from 2007 to 20011 under the Joint Powers Agreement, and maintains decision

9  making authority on its Governing Board.  By electing to fund its hospital in Martinez, which

10  treats far fewer African-Americans than DMC in the West County, these Defendants are violating

11  the civil rights of the County's African-American population, knowing its failure to fund both

12  hospitals equally will cause death and permanent disability to African-Americans.

13      **B.    Eliminating Services at DMC Has a Disparate Impact on African-Americans**
        **and Violates Section 11135 of the California Government Code.**

14

15      California also prohibits recipients of state funding from engaging in conduct that subjects

16  a person to discrimination on the basis of "ethnic group identification, religion, age, sex, color, or

17  a physical or mental disability."  Cal. Gov. Code. §11135(a); Cal. Code Regs, tit. 22, §9810(1).

18  This California statute not only prohibits purposeful discrimination but also conduct that "has the

19  effect of subjecting a person to discrimination" on such bases.  *Id.*  Consequently, California

20  allows a disparate impact analysis of such conduct; and for a plaintiff to establish a prima facie

21  case of disparate impact discrimination, she must show:

22      (1) the occurrence of certain outwardly neutral practices, and (2) a significantly
        adverse or disproportionate impact on persons of a particular type produced by the

23      defendant's facially neutral acts or practices.  Demonstration of discriminatory
        intent is not required under disparate impact theory.

24

25  *See, e.g., Gamble v. City of Escondido,* 104 F.3d 300, 306 (9th Cir. 1997).

26      The Ninth Circuit has found disparate impact in various contexts. In *Keith v. Volpe,* 858

27  F.2d 467, 484 (9th Cir. 1988), the Ninth Circuit determined that the city's refusal to permit

28  construction of a state-assisted housing project "had a greater adverse impact on minorities. Of the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

persons who would benefit from the state-assisted housing because they are low-income displacees, two-thirds are minorities."  In *Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1486 (9th Cir. 1993), the Ninth Circuit, in considering an employer's English-only policy, held that "it is beyond dispute that, in this case, if the English-only policy causes any adverse effects, those effects will be suffered disproportionately by those of Hispanic origin."  Finally, in reversing the District Court's dismissal of a Section 11135 allegation on other grounds, the Ninth Circuit stressed that although the District Court rejected plaintiffs' statistical evidence in "analyzing a  claim under equal protection," the court found, "in the course of analyzing plaintiffs' companion California Government Code §11135 claim, that plaintiffs **had** presented some evidence of disparate impact." *The Committee Concerning Community Improvement v. City of Modesto,* 583 F.3d 690 (9th Cir. 2009).

Here, plaintiffs have shown much more than "some evidence" of disparate impact with regard to closing the DMC STEMI Cardiac Unit, diverting of ambulances from DMC's Emergency Department, and capping DMC's inpatient beds to a maximum of 50.  As set forth above in the discussion of intentional Title VI discrimination, state and county data demonstrate that the patients served at DMC are largely black and elderly, while the patients served at CCRMC are primarily white and young, with relatively few African-American or elderly patients. [Exh. 3 of Application and Complaint]

    **C.**        **Eliminating Services at DMC Violates the Americans with Disabilities Act.**

As public entities that receive federal financial assistance, Defendants CCC and WCCHD are subject to the requirements of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§12131-12134, which provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity."  29 U.S.C. §12132.  A "qualified individual" under Title II is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices" otherwise is eligible to receive "services or the participation in programs or activities provided by a public entity." Medical conditions covered by the ADA include, but are "not limited to, such diseases and conditions as orthopedic,

13

1    visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple

2    sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and drug addition

3    and alcoholism." 45 C.F.R. §1181.103.

4         Disabled class members will be denied access to public services as a result of Defendants'

5    actions.  DMC serves patients who suffer from numerous chronic, life-threatening health

6    conditions, including cardio-vascular disease.  A STEMI receiving facility is a hospital that has

7    the equipment, expertise and facilities to administer percutaneous coronary intervention (PCI), a

8    mechanical means of treating STEMI patients with a stent to open blocked arteries, also known as

9    coronary angioplasty. As Nurse Arrington stresses in her Declaration, "[a]lthough PCI is the

10   preferred means of treating STEMI patients, very few hospitals are equipped to do so. Doctors

11   Medical Center is the only hospital in west Contra Costa County with a cath lab and the necessary

12   physicians and Nurses with the expertise to perform emergency PCI procedures on STEMI

13   patients." [Arrington Dec. ¶ 3.]

14        Patients who do not have prompt access to the medications and services provided in

15   DMC's STEMI will be put at substantially increased risk of death or other devastating health

16   impacts.  For instance, if "TPA," a drug that is needed to be administered immediately by a

17   physician is not provided promptly, the patient could suffer irreparable brain damage. [Drager

18   Decl.]  Patients with chronic heart conditions like Plaintiff Class Member Betty Rodgers will be

19   deprived of STEMI services, deprived of inpatient beds for admission, and may even die on the

20   way to the hospital without ambulance service, because of Defendants' actions.  In *Rodde v. Los*

21   *Angeles,* 357 F.3d 988 (9th Cir. 2003), the Ninth Circuit upheld the District Court's preliminary

22   injunction preventing the closure of a Los Angeles hospital, agreeing that plaintiffs health care

23   needs could not be met in the Los Angeles area if the hospital closed.  The same is true here.  As

24   the County admits, the complex treatment provided by DMC's STEMI Unit is nowhere else to be

25   found in West County.

26        Moreover, patients with circulatory system diagnoses made up 25.14 percent of all

27   inpatient discharges in 2013.  Such patients, like Betty Rodgers, when faced with their chronic

28   condition becoming acute will also require speedy transport by ambulance for prompt medical

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY
RESTRAINING ORDER

treatment.  Yet by Defendants' actions, transport times will increase by 15-27 minutes according to the County's own studies. Without the grant of a temporary restraining order, these patients will then, as the evidence reflects, face a much greater chance of death or irreparable health consequences.

**D.    Eliminating Services at DMC Violates the Age Discrimination Act of 1975.**

The Age Discrimination Act of 1975 (the Age Act) provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. 6101 et seq.  Defendants CCC, WCCHD, and Defendants Goia, Walker, Pepho, Michoff, Glover and Anderson have blatantly violated the Age Discrimination Act of 1975 by their actions, which disproportionately and disparately impact seniors.  Patients aged 60 or older accounted for 61.6 percent of Hospital Inpatient Discharges and 17.47 percent of Emergency Department encounters at DMC in 2013, while only 19.11 percent of Hospital Inpatient Discharges and 11.62 percent of Emergency Department encounters at CCRMC were patients aged 60 or older.  The Age Act's coverage is plenary, prohibiting all age discrimination by any program or activity receiving federal funds.  *See Rannels v. Hargrove,* 731 F.Supp. 1214 (E.D. Pa. 1990).

Eliminating the STEMI unit, increasing travel times due to ambulance diversion, and reducing the number of hospital beds to 50 will fall particularly hard on the population of patients age 60 and older, as reflected by Plaintiff Rodgers, suffering from heart disease that could require at any moment's notice that she be transported speedily to the hospital to avoid permanent health consequences or death.  Defendants CCC and Defendants Goia, Walker, Piepho, Michoff, Glover and Anderson know full well, from State data, of the enormous disparity in treatment of persons aged 60 or over when comparing CCRMC in Martinez and DMC in San Pablo.  Nonetheless, they are, by their funding choices, allowing such devastating health consequences to befall the elderly of West County. The County, again, is a continuing joint venture with the Defendant WCCHD, as it financially supported it from 2007 to 20011 under the Joint Powers Agreement, and maintains decision making authority on its Governing Board.

**E.      Eliminating Services at DMC Violates the Medicaid Act.**

Medicaid is a federal-state program under which states provide medical assistance to low-income residents with financial participation from the federal government.  Although state participation in Medicaid is not mandatory, once a state elects to participate, it "must comply with requirements imposed both by the [Medicaid] Act itself and by the Secretary of Health and Human Services." *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37 (1981).  *See also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 500 (1990).  California participates in the federal Medicaid program through the state's Medi-Cal program.  Cal. Welf. & Inst. Code § 14000 *et seq.*

Under federal Medicaid law, the state and its political subdivisions must ensure that all Medicaid beneficiaries have access to medically necessary care with "reasonable promptness." 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930. Additionally, federal Medicaid regulations require Medicaid plans to ensure that their networks are adequate considering the geographic location of providers and enrollees, in terms of distance and travel time. 42 C.F.R. § 438.206(b)(1)(v). In calculating the appropriate distance and travel time requirements, plans must account for the means of transportation used by Medicaid enrollees. *Id.* Medicaid plans must also demonstrate that their provider networks offer sufficient "geographic distribution" to provide access to covered services. *Id.* §438.207(b)(2). California complies with these requirements by mandating that plans to make primary care services available within 30 minutes or 10 miles of an enrollee's residence, unless the state has approved an alternative standard. Cal. Code Regs, tit. 22, § 53885(a). In addition, the State must ensure that Medi-Cal recipients have access to Medi-Cal services to the same extent as persons in the geographic area with private health coverage.  42 U.S.C. § 1396(a)(30)(A); 42 C.F.R. § 447.204.

By their actions, Defendants will violate these and other Medicaid provisions.  Timely access to care will be denied by the diversion of ambulance services, which, as set forth above, will lead to much longer transport times that could lead to death or other adverse patient outcomes. Moreover, Medi-Cal recipients will not have access to Medi-Cal services to the same extent as persons in the geographic area with private health coverage with the closure of the STEMI unit and the reduction of inpatient beds to 50.

**F.      Eliminating Services at DMC Violates California Welfare & Institutions Code**

In California, counties are deemed the health care provider of last resort under Cal. Welf. & Inst. Code § 17000.  Section 17000 provides:

> Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

The Board of Supervisors of each California county is required "to adopt standards of aid and care for the indigent and dependent poor of the county or city and county." Welf. & Inst. Code § 17001.  Financial difficulties do not relieve a county of its duties under Section 17000.  *See, e.g.*, *County of San Diego v. State of California,* 15 Cal.4th 68, 106 n.30 (1997); *Gardner v. County of Los Angeles, 34* Cal. App. 4th 200, 226 (1995); *Mooney v. Pickett,* 4 Cal. 3d 669, 680 (1971). As Plaintiff Tufail states in his Declaration, DMC provides medical services to the many indigent residents of Contra Costa County, who will have nowhere else to turn.  Defendant CCC was aware of this duty in 2007, when it entered the Joint Powers Agreement, in the County's own words, based on its "statutory obligation under California Welfare & Institutions Code § 17000 to relieve and support incompetent, poor and indigent residents of Contra Costa County who are incapacitated by age, disease, or accident and lack insurance or other health care resources."  By depriving the indigent in West County of ambulance services, bed capacity, and STEMI Unit treatment at DMC, these Defendants are abandoning their duties to this population in violation of California law.

**G.      Defendants WCCHD and CCC Did Not Provide the Required Health & Safety Code Notice of Reduction of Emergency Medical Services.**

Cal. Health & Safety Code Section 1255.1(a) requires that "any hospital that provides emergency medical services under Section 1255 shall, as soon as possible, but not later than 90 days prior to a planned reduction or elimination of the level of emergency medical services, provide notice of the intended change to the state department, the local government entity in charge of the provision of health services, and all health care service plans, or other entities under

17

contract with the hospital to provide services to enrollees of the plan or other entity."

Clearly, no such notice was provided, as Defendant CCC and DMC jointly announced the closure of the STEMI Cardiac Unit on August 1, 2014, in which it described the STEMI Unit as "an emergency department program for the treatment of heart attack patients."

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO AND PRELIMINARY INJUNCTION.

It is difficult to imagine a situation with a greater showing of irreparable harm.  Again, DMC represents 79 percent of the inpatient capacity in the West County, and provides 59 percent of Emergency Department care in the region, receiving 62 percent of the regional ambulance traffic.

Sadly and simply put, STEMI patients will likely die during transport or suffer irreversible health damage if diverted from Doctors Medical Center, the only STEMI-receiving hospital in West Contra Costa County.  Additionally, patients in cardiac arrest will likely die if diverted because chest compressions in an ambulance cannot substitute for the specialized medical treatment provided at DMC. Stroke patients will also suffer because Kaiser Richmond, the only other local stroke center, has only 15 inpatient beds, and turns away non-Kaiser members when its resources are overwhelmed, which frequently happens even now. [Choo Decl.]  Without a TRO and an injunction, there will indisputably be great human suffering and death as a result of DMC's announced changes to services.

## IV.   THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS FAVOR.

Here, the balance of hardships tips sharply in favor of Plaintiffs. As set forth herein, many West County residents - disproportionately senior citizens, African-Americans, people with disabilities, many of whom are indigent -will likely die or suffer irreversible deleterious health impacts by Defendants' elimination of the STEMI Unit, diversion of ambulance services, and capping inpatient beds at DMC at 50.  Defendants will surely point to DMC's financial difficulties over the last several years with regard to this factor but, as the Court pointed out in *Rodde,* supra, "the  County is free to reorganize its health care system to increase efficiency and reduce costs, so long as it does so in an even-handed, non-discriminatory manner. As we have maintained, '[f]aced

1   with [ ] a conflict between financial concerns and preventable human suffering, we have little

2   difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.'"  *Id.* at 999

3   (quoting *Lopez v. Heckler,* 713 F.2d 1432, 1437 (9th Cir.1983)).

4   **V.      A TRO AND PRELIMINARY INJUNCTION ARE IN THE PUBLIC INTEREST.**

5          The public interest is a factor to be strongly considered in granting a preliminary injunction

6   to assure that patients receive essential medical services.  *Lopez v. Heckler,* 713 F.2d 1432, 1437

7   (9th Cir.), rev'd in part on other grounds, 463 U.S. 1328 (1983). The U.S. Supreme Court has

8   already characterized medical care as a "basic necessity of life."  *Memorial Hospital v. Maricopa*

9   *County,* 415 U.S. 250, 259, 261 (1974) ("The denial of medical care is all the more cruel in this

10  context, falling as it does on indigents who are often without the means to obtain alternative

11  treatment").  Preventing invidious discrimination and saving lives is unquestionably in the public

12  interest.

13  **VI.     PLAINTIFFS SHOULD NOT BE REQUIRED TO POST BOND.**

14         This Court has the discretion to issue a preliminary injunction without requiring plaintiffs

15  to post bond.  *People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency,*

16  766 F.2d 1319, *modified on other grounds*, 775 F.2d 998 (9th Cir. 1985).  Exercise of that

17  discretion is particularly appropriate where an action is brought by a class of indigent plaintiffs.

18  *Orantes-Hernandez v. Smith,* 541 F.Supp. 351 (C.D. Cal. 1982).

19                                          **CONCLUSION**

20         For the foregoing reasons, the application for a TRO and preliminary injunction should be

21  granted forthwith.  Plaintiffs pray that the Court will take swift and decisive action to prevent a

22  completely avoidable health catastrophe.

23  Dated:  August 11, 2014                    Respectfully Submitted,

24                                             LAW OFFICES OF PAMELA Y. PRICE

25
                                               /s/   *Pamela Y. Price*
26                                             _____
                                               PAMELA Y. PRICE, Attorney for Plaintiffs
27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A TEMPORARY
RESTRAINING ORDER