1 SHARON L. ANDERSON (SBN 94814)
  County Counsel
2 MONIKA L. COOPER (SBN 193729)
  Assistant County Counsel
3 TREVOR J. KOSKI (SBN 250230)
  Deputy County Counsel
4 COUNTY OF CONTRA COSTA
  651 Pine Street, Ninth Floor
5 Martinez, California 94553
  Telephone:   (925) 335-1800
6 Facsimile:    (925) 335-1866
  Electronic Mail: monika.cooper@cc.cccounty.us
7

8 Attorneys for Defendants Supervisor John Gioia,
  Health Services Director William Walker,
9 Supervisor Candace Andersen, Supervisor Mary Piepho,
  Supervisor Karen Mitchoff, Supervisor Federal Glover
10 and County of Contra Costa

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13 DMC CLOSURE AVERSION COMMITTEE            No. C14-03636 WHO
   (DCAC), et al.,
14                                           COUNTY DEFENDANTS'
                                             OPPOSITION TO PLAINTIFFS'
15         Plaintiffs,                       MOTION FOR PRELIMINARY
                                             INJUNCTION
16 v.

17 JOHN GOIA, INDIVIDUALLY AND IN HIS
   OFFICIAL CAPACITY AS CONTRA COSTA         Date:  August 27, 2014
18 COUNTY SUPERVISOR FOR DISTRICT 1,         Time:  3:30 p.m.
   et al.,                                   Crtrm:  2, 17th Floor
19                                           Judge:  Hon. William H. Orrick
           Defendants.                       Date Action Filed: August 12, 2014
20                                           Trial Date: None Assigned

21

22

23

24

25

26

27

28

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.      Plaintiffs Have Not Demonstrated A Likelihood of Success On The Merits... . . . 8

                1.      The County and the District are Separate Legal Entities... . . . . . . . . . . . . 9

                2.      The Reduction of Services by Doctors Medical Center Does Not Affect
                        the County's Abilities to Meet its Obligations.. . . . . . . . . . . . . . . . . . . 10

                        a.      The County Currently Meets and Will Continue to Meet its
                                Obligations Under Medicaid.. . . . . . . . . . . . . . . . . . . . . . . . 10

                        b.      The County Currently Meets and Will Continue to Meet its
                                Obligations Under California Welfare & Institutions Code Section
                                17000.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                        c.      The County has no Obligations Under California Health and Safety
                                Code Section 1255.1... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                3.      Plaintiffs Are Unlikely to Succeed on their Discrimination Claims.. . . . 13

        B.      Plaintiffs Have Not Established That They Will Likely Suffer
                Irreparable Harm... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      Plaintiffs Have Not Demonstrated that the Balance Of Equities
                Favors Plaintiffs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        D.      Plaintiffs Have Not Demonstrated that the Public Interest Favors Plaintiffs... . 20

V.      CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>TABLE OF AUTHORITIES</u>

CASES

*A.A. v. Raymond*, 2013 U.S. Dist. Lexis 102459 (E.D. Cal. July 22, 2013) . . . . . . . . . . . 14, 15

*Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) . . . . . . 7

*Berkeley v. Alameda County Bd. of Supervisors*, 40 Cal. App. 3d 961 (1974). . . . . . . . . . . . 12

*Bernhardt v. L.A. County*, 339 F.3d 920 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Braunstein v. Ariz. DOT*, 683 F.3d 1177 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bruggeman v. Blagojevich*, 324 F. 3d 906 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Byers v. Board of Supervisors of San Bernardino County*, 262 Cal. App. 2d 148 (1968). . . . . 9

*Center for Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . 18

*Cercpac v. Health and Hospitals Corp.*, 147 F.3d 165 (2nd Cir. 1998). . . . . . . . . . . . . . . . . 15

*Contra Costa County v. Soto,* 136 Cal. 547 (1902). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Cullen v. Netflix, Inc.* 880 F. Supp. 2d 1017 (N.D. Cal. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Darensburg v. Metropolitan Transp. Com'n*, 636 F.3d 511 (9th Cir. 2011). . . . . . . . . . . . 16, 17

*Equal Access for El Paso, Inc. v. Hawkins*, 562 F. 3d 724 (5th Cir. 2009). . . . . . . . . . . . . . . 11

*First Street Plaza Partners v. City of Los Angeles* 65 Cal. App. 4th 650 (1998) . . . . . . . . . . . 9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .. . . . . . 18

*Gensaw v. Del Norte County Unified Sch. Dist.*,
2008 U.S. Dist. LEXIS 54732 (N.D. Cal. Apr. 18, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112 (9th Cir. 2008).. . . . . . 20, 21

*Grant v. Alperovich*, 2014 U.S. Dist. Lexis 41520 (W.D. Wash. Mar. 25, 2014). . . . . . . . . . 14

*Hill v. County of Sacramento*, 2010 U.S. Dist. LEXIS 115097
(E.D. Cal. Oct. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Kennedy v. Ross,* 28 Cal.2d 569 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002) . . . . . . . . . 9

*Oklahoma Chap. of the Amer. Acad. of Pediatrics v. Fogarty*,
472 F. 3d 1208 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*P.R. Office of the Ombudsman for the Elderly v. Puerto Rico*, 665 F. Supp. 2d 74 (D.P.R. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011) . . . 18

*Partida v. Page*, 2012 U.S. Dist. LEXIS 28064 (E.D. Cal. Mar. 2, 2012). . . . . . . . . . . . . . 16

*Rashdan v. Geissberger*, 2011 U.S. Dist. LEXIS 126211 (N.D. Cal. Nov. 1, 2011). . . . . . . 16

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . 20

*San Ysidro Irrigation Dist. v. Superior Court of San Diego County*, 56 Cal. 2d 708 (1961) . . 21

*Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Stanley v. University of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . 7, 8, 18

*Stormans. Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . 18, 20, 21

*Turlock Irrigation Dist. v. Hetrick,* 71 Cal. App. 4th 948 (1999). . . . . . . . . . . . . . . . . . . . . . 9

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Westside Mothers v. Olszewski*, 454 F. 3d 532 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 11

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . 7, 8, 19, 20

*Zottman v. City and County of San Francisco*, 20 Cal. 96 (1862). . . . . . . . . . . . . . . . . . . . . . 9


STATUTES AND RULES

42 Code of Federal Regulations, section 431.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C., section 1396a *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

42 U.S.C., section 6104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C., section 18001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Civil Code, section 51. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Government Code, section 23003. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Government Code, section 25005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1

Government Code, section 56000, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2

Welfare and Institutions Code, section 14001.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3

Welfare and Institutions Code, section 17000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4

5

OTHER AUTHORITIES

6

57 Opinions of the California Attorney General 312 (1974). . . . . . . . . . . . . . . . . . . . . . . . . 9

7

8

Vicini, James; Stempel, Jonathan, *U.S. Top Court Upholds Healthcare Law in Obama Triumph*, Reuters, June 28, 2012, http://www.reuters.com/article/2012/06/28/us-usa-healthcare-court-idUSBRE85R0642012Ø628... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

Health care is a global concern.  It is also a national concern.  On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act [42 U.S.C. § 18001], commonly called the Affordable Care Act ("ACA").  The ACA is recognized to be part of the most significant regulatory overhaul of the U.S. health care system since the passage of Medicare and Medicaid in 1965.[1] The current dispute about the reduction of services at Doctors Medical Center in San Pablo makes it very clear that, most significantly, health care is, a local concern.  Nobody wants to see Doctors Medical Center close.  This litigation is evidence of that.

For nearly a decade Contra Costa County officials and employees have been working with regional health care providers, medical associations, and the State to find a solution to the overwhelming challenges faced by the West Contra Costa Healthcare District ("District") in trying to sustain Doctors Medical Center, the last remaining independent healthcare district hospital in Contra Costa County.  Unfortunately, it has become increasingly clear that the these efforts are failing.

Fundamental changes in the way this country provides health care have led to a chronic, structural operating deficit at Doctors Medical Center.  This structural deficit will not disappear.  It will only get worse over time.  Stopgap measures cannot solve this problem.  Nor can a preliminary injunction.  The fiscal reality is that the District cannot afford to operate an acute care hospital.  The hospital is hemorrhaging money.  Hospital administration has determined that patient safety requires downsizing of hospital services and an end to ambulance traffic.

The plaintiffs attempt to characterize this fiscal reality as discrimination.  There is no evidence to support this claim.  Their request for injunctive relief rests on two misleading

---

[1] Vicini, James; Stempel, Jonathan, *U.S. Top Court Upholds Healthcare Law in Obama Triumph*, Reuters, June 28, 2012, http://www.reuters.com/article/2012/06/28/us-usa-healthcare-court-idUSBRE85R06420120628.

assumptions – first, that Contra Costa County and the West Contra Costa Healthcare District are essentially one and the same; and second, that Contra Costa County's ability to fulfill its legal health care obligations depends on Doctors Medical Center remaining open and providing a certain level of service to West County residents.  Neither premise is correct.

The County and the District are separate legal entities, with separate health care responsibilities and separate legal obligations.  Since Doctors Medical Center began its financial decline a decade ago, the State Department of Health Services, Kaiser Permanente, John Muir Medical Center and the County all have provided financial support in an attempt to help the District keep Doctors Medical Center open.  This doesn't mean that they have assumed legal responsibility for the District or the hospital.

The County has its own legal obligations with regard to the provision of health care services.  The County is well aware of the State and Federal laws and regulations that apply to its delivery of these services, including the laws that prohibit unlawful discrimination.  The County can and will continue to fulfill all of its legal obligations regardless of whether Doctors Medical Center continues to scale back its services or even closes its doors.

Because the County and the District are separate legal entities with separate health care obligations under the separate laws that govern them, the plaintiffs are not entitled to injunctive relief against the County.  The plaintiffs seek a mandatory preliminary injunction that would prevent the closure of Doctors Medical Center's STEMI Cardiac Unit and would cap the number of the hospital's inpatient beds at 50.  But the County cannot be bound by this injunction, since the operation of the hospital's cardiac unit and its inpatient beds are solely within the District's control.  The plaintiffs also seek an injunction that would prevent the County from redirecting ambulances from Doctors Medical Center's emergency room to other emergency rooms.  But the plaintiffs have not demonstrated that this injunction is in the public interest or that they will suffer irreparable harm in the absence of this injunction.  In fact, any injunctive relief in this case could result in unforeseen and possibly harmful consequences that could affect every Contra Costa County resident, regardless of where they live.  The plaintiffs' motion for a preliminary injunction should be denied it its entirety.

1

## II.  FACTUAL BACKGROUND

2          The West Contra Costa Healthcare District is an independent public agency established

3   under the Local Health Care District Law.  *See* Cal. Health & Saf. Code § 32000 *et seq.*[2]  The

4   statutes that allowed the creation of independent healthcare districts (formally called "hospital

5   districts") were first enacted by the California Legislature in 1945 [Statutes of 1945, Chapter

6   932, Section 1]. This law provided for a district's exercise of powers, the territory that could

7   be included in a healthcare district and the financing of a district.

8          Pursuant to this law, three healthcare districts were formed in Contra Costa County in

9   1948.  The Los Medanos Community Healthcare District operated the Los Medanos

10  Community Hospital until 1994.  The Mt. Diablo Health Care District transferred the Mt.

11  Diablo Community Hospital to John Muir Health in 1997.  Doctors Medical Center in San

12  Pablo is owned and operated by the West Contra Costa Healthcare District.  Doctors Medical

13  Center is the last remaining hospital in Contra Costa County that is owned by a healthcare

14  district.  *See* Request for Judicial Notice ("RJN") Exhibit A  - Contra Costa Local Agency

15  Formation Commission Public Healthcare Services Municipal Service Review, Approved

16  August 8, 2007, page 2-2 ("LAFCO MSR").

17         As is noted in the LAFCO MSR, healthcare districts were originally created to help

18  support the health care needs of rural, underserved areas.  As a consequence of rising health

19  care costs, reimbursement restrictions, and declining public financing through Medi-Cal and

20  Medicare, many healthcare districts have had to discontinue hospital operations.[3]  In 2006, the

21  West Contra Costa Healthcare District found itself overcome with debt and filed for Chapter 9

22  bankruptcy protection on October 1, 2006.  *See* RJN, Ex. A, LAFCO MSR, p. 6-1; Declaration

23  of Eric Zell ("Zell Dec."), ¶¶ 15-19.

24  ///

25

26         [2]  Unless otherwise specified, all statutory references are to California Codes.

27         [3]  According to the LAFCO MSR, in 2007 only about two-thirds of California's 85 healthcare

28  districts owned a hospital.  *See* RJN, Ex. A, LAFCO MSR, p. 2-1.

1    That is when the District reached out to the County for help. District representatives

2  informed the County that the hospital would not be able to meet the next payroll and that it

3  would likely close that November, absent an immediate infusion of cash. *See* Declaration of

4  Patrick Godley in Opposition to Motion for Preliminary Injunction ("Godley Dec."), ¶ 2. The

5  County responded without delay and was able to help Doctors Medical Center by arranging an

6  intergovernmental transfer of funds with the State. In exchange for $10 million from the

7  County General Fund, the District received enhanced Medi-Cal payments of $20 million from

8  the State Department of Health Services. As a condition of this transfer, the District pledged

9  approximately four years of its *ad valorem* taxes to repay the County advance. The property

10  tax transfer began on July 1, 2007, and continued until the County received $11.5 million in

11  consideration for the $10 million advance. *See* Godley Dec., ¶¶ 3-4 and 18.

12    This was the first of four County General Fund/District property tax transfers between

13  the District and the County. Over the next eight years, the District had to request emergency

14  relief from the County three more times in order to avoid closure. During this period, the

15  District also sought and received help from other sources. Kaiser Permanente contributed $12

16  million in grant funds. John Muir Health Center provided a grant of $3 million. *See* Godley

17  Dec., ¶ 17. The District tried to help itself in other ways too. With the help of the County, it

18  created the DMC Management Authority ("DMC Authority"), a joint exercise of powers

19  agency, formed as a separate legal entity under the authority of Government Code section 6500

20  *et seq*. The DMC Authority did not replace the District governing body and did not own the

21  hospital. The purpose of the DMC Authority was to establish an oversight board with public

22  hospital expertise. It was thought that this would give the District a chance to stabilize, place a

23  parcel tax measure on the ballot, emerge from bankruptcy, and attract financial contributions

24  from other hospitals, the State of California, and private institutions. *See* Godley Dec., ¶¶ 4-7.

25    The DMC Authority was able to initiate structural changes to billing practices, staffing

26  and contract negotiation. It also negotiated a Medi-Cal contract increase of $36 million over

27  three years. *See* Godley Dec., ¶¶ 8-9. In 2011, the parties terminated the DMC Authority. In

28  its place the District formed an eleven member Hospital Governing Body to oversee hospital

1   operations.  The Hospital Governing Body is not a separate legal entity.  Doctors Medical

2   Center continues to be owned by the District.  The Hospital Governing Body includes five

3   members of the District Board, two members nominated by the District's medical executive

4   committee and four County representatives.  County representatives do not comprise a

5   majority of the Hospital Governing Body and do not control the actions of the District or of the

6   Hospital Governing Body.  *See* Godley Dec., ¶¶ 11-13.

7        Since 2006, the District has averaged an annual operating deficit of $18 million per

8   year.  *See* Godley Dec., ¶ 16.  Between 2006 and 2014, the County advanced a total of $35

9   million from the County General Fund to, or on behalf of, the District to assist with

10   community efforts to keep Doctors Medical Center open.  As noted above, the County required

11   that these advances be repaid by annual property tax transfers from the District to the County.

12   It is not anticipated that the County advances will be fully repaid until about 2022.  *See* Godley

13   Dec., ¶¶ 10, 14-16, and 18.

14        In May 2014, the District asked its voters to approve Measure C, a parcel tax intended

15   to support ongoing District operations.  If the parcel tax had been successful it would have

16   supported the services requested in plaintiffs' motion.  *See* RJN Exhibit M [Contra Costa

17   County Special By Mail Election Ballot Insert]; *see* Zell Dec., ¶¶ 25-26.  The parcel tax

18   measure failed.  As a result, Doctors Medical Center will have to close.  *See* Declaration of

19   Dawn Gideon ("Gideon Dec.") ¶¶ 5-6, 8 and 20-24.  The County does not have funding

20   available to acquire Doctors Medical Center or to support ongoing operations.  *See* Declaration

21   of David Twa in Opposition to Motion for Preliminary Injunction ("Twa Dec.), ¶¶ 2-8; *See*

22   Declaration of William Walker in Opposition to Motion for Preliminary Injunction ("Walker

23   Dec."), ¶ 4.

24        In addition to the extraordinary efforts that the County has taken over the years to try

25   and help the District keep Doctors Medical Center from closing, the County also has used

26   Doctors Medical Center as a paid provider of Medi-Cal services, as is the case with other

27   health care providers in the region.  Walker Dec., ¶ 23.  The Contra Costa Health Plan (CCHP)

28   is a County sponsored, Knox-Keene licensed and federally qualified health plan, the first in the

1    nation. People in this County who enroll in Medi-Cal for insurance benefits must choose

2    between CCHP or Blue Cross to provide coverage for Medi-Cal services. More than 85

3    percent of those people choose CCHP. Walker Dec., ¶ 14. If a person enrolled in Medi-Cal

4    chooses CCHP, they can receive their care from one of the following: Contra Costa Regional

5    Medical Center and its Health Centers; the Community Provider Network, which is a network

6    of private physicians and two community clinics; or, for former Kaiser members, from Kaiser

7    Permanente. Walker Dec., ¶ 15.

8        Medi-Cal recipients and commercial members of the Contra Costa Health Plan may

9    receive pre-approved inpatient medical services at Doctors Medical Center. The same is true

10    for those individuals who qualify for services under Welfare and Institutions Code section

11    17000. Currently, about 400 individuals (minors under the age of 19) receive medical services

12    under the County's Basic Health Care Program. *See* Walker Dec., ¶ 21. These individuals

13    may receive pre-approved, non-emergency care at this facility under the County's Basic Health

14    Care program. For CCHP members (commercial and Medi-Cal), CCHP also pays for both

15    emergency care and pre-approved, non-emergency care at Doctors Medical Center. However,

16    if Doctors Medical Center were to cease operation, these services can be obtained by CCHP

17    members or individuals covered by Welfare and Institutions Code section 17000 at many other

18    locations in the region, depending on the services needed. *See* Walker Dec. ¶¶ 17-23.

19        On July 22, 2014, the Contra Costa County Emergency Medical Services Agency

20    ("EMS Agency") was notified that Doctors Medical Center was going to have to close its

21    doors to all incoming emergency ambulance traffic as of August 12, 2014, because the number

22    of resignations from physicians and other employees had caused critical staffing shortages.

23    *See* Declaration of Patricia Frost in Opposition to Motion for Preliminary Injunction ("Frost

24    Dec."), ¶ 4. Due to serious concerns about excessive wait times at Doctors Medical Center

25    Emergency Department, it was determined that emergency ambulance service could not safely

26    be received at Doctors Medical Center. For this reason, effective August 7, 2014, the EMS

27    Agency started directing ambulances to locations other than Doctors Medical Center, in

28    accordance with the EMS Agency's contingency plan. Frost Dec., ¶¶ 7-12.

---

1     Aside from the contingency planning specific to Doctors Medical Center, the EMS

2  Agency has planned and is prepared to make immediate modifications to the EMS System

3  whenever it is necessary to do so.  The EMS Agency used this methodology to plan and

4  coordinate its response to Doctors Medical Center's notification.  It would use the same tools

5  and approach to respond to any event, making modifications in accordance with the specific

6  event.  Frost Dec., ¶ 11.

7     Contra Costa County is served by 16 regional acute-care hospitals.  From August 7

8  through August 14, 2014, there were 354 emergency ambulance transports from West County.

9  They were taken to various hospitals in the area.  The choice of hospital depended either on the

10  nature of the emergency services required, location or both.  Frost Dec., ¶¶ 13-24.  For patients

11  identified as trauma, pediatric critical medical, stroke, psychiatric, or STEMI patients, there

12  have been no reports of adverse outcomes that are attributable to the redirection of ambulances

13  away from Doctors Medical Center to other receiving hospitals.  Frost Dec., ¶ 14-20 and 24.

14                                   **III.  LEGAL STANDARDS**

15     A preliminary injunction is an "extraordinary and drastic remedy, one that should not be

16  granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v.*

17  *Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*).  A plaintiff seeking a preliminary

18  injunction must establish that: 1) he is likely to succeed on the merits; 2) he is likely to suffer

19  irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in his

20  favor; and 4) an injunction is in the public interest.  *See Winter v. Natural Res. Def. Council,*

21  *Inc.*, 555 U.S. 7, 20 (2008); *see also Am. Trucking Associations, Inc. v. City of Los Angeles*,

22  559 F.3d 1046, 1052 (9th Cir. 2009) ("To the extent that our cases have suggested a lesser

23  standard [than that announced in *Winter*], they are no longer controlling, or even viable.").

24  Where a preliminary injunction seeks not to preserve the status quo, but rather to force another

25  party to take an affirmative action, "the district court should deny such relief unless the facts

26  and law clearly favor the moving party."  *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320

27  (9th Cir. 1994) (citation omitted).  Such an injunction, known as a mandatory injunction, "goes

28

---

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                                      7

1  well beyond simply maintaining the status quo . . . [and] is particularly disfavored." *Id.*
2  (citation omitted).

3       Here, plaintiffs seek a mandatory injunction against the County.  Plaintiffs request that
4  the County be prohibited from closing the hospital's STEMI Cardiac Unit, diverting
5  ambulances from the Emergency Department, and capping inpatient beds to a maximum of
6  50 beds.  These outcomes, or the conditions that necessitated them, have already occurred.[4]
7  Moreover, the County does not control operational decisions for the District or the hospital.
8  As the plaintiffs allege in the Complaint, the hospital is "owned and operated" by Defendant
9  West Contra Costa Healthcare District, a legal entity separate from the County.  Plaintiffs'
10 Complaint ("Complaint") (Doc. 1), ¶ 41.  Plaintiffs' requested relief assumes that this Court
11 can, through injunctive relief, ensure that Doctors Medical Center resumes operation of a fully
12 staffed Emergency Department.  This is not the status quo.  Hospital medical staff either have
13 left to find employment elsewhere or will be leaving Doctors Medical Center in the near
14 future.  *See* Gideon Dec. ¶¶ 11, 14, 18-23.  The plaintiffs assume that this Court can and
15 should order that ambulances be directed back to Doctors Medical Center.  That is not the
16 status quo.  The plaintiffs assume that the County can be forced to acquire the hospital or
17 assume responsibility for the District's hospital operations.  This is not, nor has it ever been,
18 the status quo.  Accordingly, plaintiffs must meet the "higher degree of scrutiny" required for
19 mandatory injunctions.  *Id.*

20                    **IV.  LEGAL ARGUMENT**

21 **A.     Plaintiffs Have Not Demonstrated A Likelihood of Success On The Merits.**

22      A plaintiff seeking a mandatory preliminary injunction must clearly establish that he is
23 likely to succeed on the merits.  *See Winter*, 555 U.S. at 20; *Stanley*, 13 F.3d at 1320.  Where a
24 plaintiff cannot meet this threshold element, a court need not consider the remaining elements

25 _____

26      [4]  Ambulance service was diverted on August 7, 2014.  Frost Dec., ¶ 8.  The closure of Doctors
   Medical Center's STEMI Cardiac Unit and capping of Doctors Medical Center's inpatient beds is
27 necessary because, at the time this lawsuit was filed, Doctors Medical Center no longer had the staff
   required to provide these services.  Declaration of Dawn Gideon, ¶¶ 13, 19; Declaration of Kathy
28 White, ¶¶ 4-5.

_____

1    in the preliminary injunction test.  *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*,

2    287 F.3d 1, 9 (1st Cir. 2002) ["The sine qua non of (a court's injunctive) inquiry is likelihood

3    of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in

4    his quest, the remaining factors become matters of idle curiosity."].  Here, plaintiffs have not

5    demonstrated a likelihood of success, much less met the heightened standard required for a

6    mandatory injunction.

7              **1.      The County and the District are Separate Legal Entities.**

8              The County and the District are two separate legal entities and are governed by different

9    laws.  A county has only those powers expressly granted to it by the state constitution or by

10   state statutes and those necessarily implied from the expressed powers.  *See* Gov. Code, §

11   23003; *Byers v. Board of Supervisors of San Bernardino County*, 262 Cal. App. 2d 148 (1968);

12   57 Ops. Cal. Atty. Gen. 312, 313 (1974).  A county acts through its board of supervisors.  It

13   takes a majority of the members of the board of supervisors to take action on behalf of a

14   county.  *See* Gov. Code, § 25005.  Only the board of supervisors can make policy decisions on

15   behalf of a county and take actions based on those decisions.  *See Contra Costa County v.*

16   *Soto,* 136 Cal. 547, 550 (1902).  Because the Legislature has established how a board of

17   supervisors must exercise its power, the statutory requirements must be followed in order to

18   make it a valid exercise of power.[5]

19             The same general rule applies to districts of limited powers, such as a healthcare

20   district.  A district of limited powers has only those powers given to it by its enabling statutes

21   or other legislation applicable to special districts, and a district cannot exceed those powers.

22   *See Turlock Irrigation Dist. v. Hetrick,* 71 Cal. App. 4th 948, 953 (1999).  The powers of

23   healthcare districts are set forth in the Local Health Care District Law, commencing with

24   Section 32000 of the Health and Safety Code.

25

26   _____

27        [5] *Zottman v. City and County of San Francisco*, 20 Cal. 96, 102 (1862); *Kennedy v. Ross,* 28
     Cal.2d 569, 581 (1946) ("The mode prescribed for the exercise of power by a public officer is the
     measure of the power.); *First Street Plaza Partners v. City of Los Angeles* 65 Cal. App. 4th 650, 667

28   (1998) ("[A] contract made in disregard of the prescribed mode is unenforceable.")

_____

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                                                          9

1   Government Code section 26227 authorizes the board of supervisors of any county to

2   appropriate and expend money from the general fund of the county to fund programs deemed

3   to be necessary to meet the health care needs of the population of the county.  The County

4   General Fund transfers to the District were authorized by this statute.

5   The fact that the County rendered emergency financial and management assistance to

6   the District so the District could continue to provide health services to the population of West

7   Contra Costa County cannot be used to impose a legal obligation on the County to continue to

8   provide that assistance to the District.  Nor can a preliminary injunction be used to create a

9   merger of the two public agencies that would require the County to assume the obligations of

10  the District.  The Legislature has determined that local agency formation commissions have

11  the sole and exclusive authority to effect this type of organizational change, under the

12  procedures provided in the Cortese-Knox-Hertzberg Local Government Reorganization Act of

13  2000.  *See* Gov. Code, § 56000, et seq.

14  Plaintiffs' argument that the County's assistance to the District has created an ongoing

15  "obligation to provide necessary support and funding for continuing DMC operations"

16  [Motion for TRO, Doc. 3, 3:28-4:2] finds no support in the law.  Because the County and the

17  District are separate legal entities and the County does not own or control Doctors Medical

18  Center, all claims against the County must fail.

19  **2.     The Reduction of Services by Doctors Medical Center Does Not Affect the
         County's Abilities to Meet its Obligations.**

20

21  **a.     The County Currently Meets and Will Continue to Meet its
             Obligations Under Medicaid.**

22  Contra Costa County is in compliance with the Medicaid Act (Title XIX of the Social

23  Security Act, 42 U.S.C. §1396a et. seq. ("Act")). Although the Complaint contains two

24  purported causes of action for alleged violations of the Act, it fails to identify any duty that the

25  County has under the Act (as opposed to duties that the California Department of Health Care

26  Services may have) or to allege any conduct that fails to meet such a duty.

27  Plaintiffs seem to assert that the County and other subdivisions of the State have

28  primary responsibility for the Medicaid program.  Medicaid requires that the participating state

---

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                    10

1  establish or designate "a single State agency" responsible for administrating or supervising the

2  administration of the Medicaid program.  *See* 42 U.S.C. §1396a(a)(5).  The single State agency

3  "may not delegate, to other than its own officials, the authority to supervise the plan or to

4  develop or issue policies, rules, and regulations on program matters."  42 C.F.R. §431.10(e).

5  The California Department of Health Care Services ("DHCS") is the single state agency

6  responsible for implementing California's version of Medicaid, the Medi-Cal program.  *See*

7  Welf. & Inst . Code § 14100.1.  Section 1 of California's State plan also sets forth the

8  designation and authority of DHCS as the single State agency, which California's Attorney

9  General has certified.  *See* Request for Judicial Notice ("RJN"), Exhibits P and Q.  Since

10  Contra Costa County is not the state agency responsible for compliance with the Medicaid Act,

11  it is not responsible for (and cannot be sued for) any alleged failure by the State to comply

12  with the Act.

13       Plaintiffs' claims also fail because they do not allege any conduct that does not comply

14  with the Medicaid Act.  The Ninth Circuit has held that 42 U.S.C. § 1396a(a)(30)(A) does not

15  create a privately enforceable right.  *See Sanchez v. Johnson*, 416 F.3d 1051, 1059-60 (9th Cir.

16  2005).  With respect to 42 U.S.C. section 1396a(a)(8) and 42 CFR section 435.930, which is

17  the federal regulation implementing that statute's requirements, there is no obligation for the

18  State to create new medical infrastructure (or to maintain existing infrastructure) in order to

19  give  Medicaid enrollees better or quicker access to care than that enjoyed by the general

20  public.[6]

21  //

22  //

23  //

---

[6] The limitation of services at Doctors Medical Center will affect the general public to the same extent that it affects Medicaid patients.  Moreover, although the Ninth Circuit has not ruled on the issue, the Fifth, Sixth, Seventh, and Tenth Circuits have all rejected the argument that §1396a(a)(8) guarantees prompt medical care and services to Medicaid recipients.  *See Equal Access for El Paso, Inc. v. Hawkins*, 562 F. 3d 724, 727 (5th Cir. 2009); *Westside Mothers v. Olszewski*, 454 F. 3d 532, 540 (6th Cir. 2006); *Bruggeman v. Blagojevich*, 324 F. 3d 906, 910 (7th Cir. 2003); *Oklahoma Chap. of the Amer. Acad. of Pediatrics v. Fogarty*, 472 F. 3d 1208, 1214 (10th Cir. 2007).

1

**b.    The County Currently Meets and Will Continue to Meet its Obligations Under California Welfare & Institutions Code Section 17000.**

2

3      Plaintiffs' Eighth Cause of Action (Violation of California Welfare and Institutions

4   Code) alleges that the announced closure of Doctors Medical Center's STEMI Cardiac Unit,

5   the diversion of ambulances from Doctors Medical Center's Emergency Department , and a

6   cap of Doctors Medical Center's inpatient beds to a maximum of 50 violated the duties

7   imposed by Welfare and Institutions Code section 17000.  This allegation finds no support in

8   the facts or the law.

9      Welfare and Institutions Code section 17000 requires every county to "relieve and

10  support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or

11  accident, lawfully resident therein, when such persons are not supported and relieved by their

12  relatives or friends, by their own means, or by state hospitals or other state or private

13  institutions."  The County has broad discretion to determine how to discharge its duty under

14  this statute with respect to eligibility for indigent care, and the type, amount, and conditions.

15  *See Berkeley v. Alameda County Bd. of Supervisors*, 40 Cal. App. 3d 961, 971 (1974).

16     The County fulfills its obligations under Welfare and Institutions Code section 17000

17  by providing health care services for the medically indigent at its Contra Costa Regional

18  Medical Center in Martinez, California ("Regional Medical Center"), and at licensed clinics

19  located throughout the County.  The County supplements the care provided by the Regional

20  Medical Center and its licensed clinics by purchasing specialized medical services, such as

21  cardiac care and high risk obstetrics, from contract hospitals. *See* Walker Dec. ¶¶ 18-23.

22     Contrary to the plaintiffs' unsupported assertions, it is not necessary that Doctors

23  Medical Center continue operating as an acute care hospital in order for the County to fulfill

24  its obligations to the Section 17000 population.  The County will continue to fulfill these

25  obligations regardless of whether Doctors Medical Center is open, downsized or closed.  *See*

26  Walker Dec. ¶ 24.  The County's efforts to help the District try and prevent Doctors Medical

27  Center from closing had nothing to do with the County's Section 17000 obligations, nor does

28  this statute obligate the County to keep Doctors Medical Center open to serve the

---

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                                          12

1  approximately 400 individuals throughout the County, who receive services under the

2  County's Section 17000 program.  *See* Godley Dec., ¶ 19.

3         **c.    The County has no Obligations Under California Health and Safety
              Code Section 1255.1.**

4

5         Plaintiffs allege that the District and the County failed to provide notice of the reduction

6  of emergency medical services (Memorandum of Points and Authorities in Support of TRO

7  and Preliminary Injunction ("TRO Motion") (Doc. 3), 17:22) and that both have a statutory

8  duty to do so.  Plaintiffs cite Health & Safety Code section 1255.1 as authority for this

9  allegation.  Section 1255.1 provides that the "facility" is the entity required to provide notice in

10 the described circumstance.  The duty to provide notice, if there was one, belonged to the

11 District, not the County.

12        The only notice requirement that applies to the County pertains to the preparation of an

13 Impact Evaluation Report, which must be prepared in accordance with Health and Safety Code

14 section 1300.  The State Department of Health Care Services will not approve a downgrade or

15 closure of emergency services (when a licensee surrenders his license for cancellation or

16 suspension) without receiving an Impact Evaluation.  Among other requirements, the Impact

17 Evaluation must describe the impact of the closure on the community, including community

18 access to emergency care and how the closure will affect emergency services provided by

19 other entities.  When the EMS Agency was notified on April 15, 2014, that Doctors Medical

20 Center would be closing, the County fulfilled its statutory duty under Health and Safety Code

21 section 1300 to hold a public hearing and prepare the Impact Evaluation Report, which was

22 then submitted to the appropriate state departments within the statutorily required period.

23 Frost Dec. ¶ 5.

24        **3.    Plaintiffs Are Unlikely to Succeed on their Discrimination Claims.**

25        Plaintiffs allege age, race, and disability discrimination based upon several federal laws.

26 Plaintiffs fail to recognize that the County did not make any decision affecting a reduction of

27 services at Doctors Medical Center, and thus the County is not a proper defendant for these

28 claims.  Additionally, a reduction of services by Doctors Medical Center will equally affect the

1  population in West County as a whole, not just a racial minority group, the elderly, or the

2  disabled.  Something that affects all residents of the region cannot be grounds for an unlawful

3  discrimination claim.

4        Plaintiffs' claims of discrimination appear to be based, in part, on the premise that it is

5  discriminatory to expect West County residents to travel to the Regional Medical Center. This

6  issue was resolved 20 years ago.  In *Latimore v. Contra Costa County*, plaintiffs'

7  discrimination claims based on locating the County's Regional Medical Center in Martinez,

8  instead of West County, were rejected and the case was dismissed.  *See* RJN Exs. 2-4.  As the

9  District Court in that case noted:  "[The plaintiffs'] argument fails because absolute equality is

10  not required under Title VI."  *See* RJN Ex. 2 (Order Granting Defendants' Motion to Dissolve

11  Preliminary Injunction), 5:9-10.  The salient point is equality of access to medical care, not

12  access to medical care at a particular facility.  The County does not discriminate in the

13  provision of health care and provides West County residents, including people of color, the

14  elderly, and the disabled, with access to medical services.  *See* Walker Dec., ¶¶ 7-11.

15        Each discrimination claim fails for various reasons.[7]  First, plaintiffs cannot maintain an

16  action for violation of the Age Discrimination Act of 1975 because they did not comply with

17  the mandatory notice requirement or exhaust their administrative remedies.  42 U.S.C. §§

18  6104(e), (f);  *Grant v. Alperovich*, 2014 U.S. Dist. Lexis 41520, *7-8 (W.D. Wash. Mar. 25,

19  2014); *P.R. Office of the Ombudsman for the Elderly v. Puerto Rico*, 665 F. Supp. 2d 74, 78

20  (D.P.R. 2009).

21        Next, plaintiffs are unlikely to prevail on their equal protection claims because they

22  cannot show both discriminatory impact and discriminatory intent.  *See A.A. v. Raymond*, 2013

23  U.S. Dist. Lexis 102459, *46-47 (E.D. Cal. July 22, 2013) [request for preliminary injunction

24  denied to stop school closure even though disparate impact shown because no evidence of

25  discriminatory intent]; *Hill v. County of Sacramento*, 2010 U.S. Dist. LEXIS 115097, 10 (E.D.

26  _____

27      [7]  Plaintiffs other than patients of Doctors Medical Center have no standing to bring an action alleging violation of Equal Protection of the Laws.  *See Braunstein v. Ariz. DOT*, 683 F.3d 1177, 1185 (9th Cir. 2012) ["Even if the government has discriminated on the basis of race, only those who are

28  'personally denied' equal treatment have a cognizable injury under Article III."].

1  Cal. Oct. 27, 2010) ["If a government action or policy has a discriminatory impact on an

2  identifiable group, the intent requirement will only be satisfied through specific evidence

3  tending to 'show some invidious or discriminatory purpose underlies the policy.'"]  Plaintiffs'

4  Complaint alleges disparate treatment in violation of the ADA.[8]  However,  to establish a

5  prima facie case of disparate impact under the ADA, plaintiffs must show they were "denied

6  'meaningful access' to state-provided services."  *A.A.*, 2013 U.S. Dist. Lexis 102459, *66.

7  Here, patients will have meaningful access to medical services at other medical facilities.

8  There is absolutely no evidence that any legally required services will be lost.

9        Plaintiffs also cannot show that they are affected differently than *any other* resident in

10  West County, including the non-minority poor, the middle class, or the wealthy.  Everyone will

11  be impacted equally by the reduction of services at Doctors Medical Center.  In *Cercpac v.*

12  *Health and Hospitals Corp*., plaintiffs alleged a violation of the ADA due to the closure of a

13  hospital that provided specialized services to disabled children.  147 F.3d 165 (2nd Cir. 1998).

14  The trial court dismissed the case because the plaintiffs did not allege that they were denied

15  care available to nondisabled children.  Instead they argued that the hospital closing would

16  eliminate or reduce some services they needed, and would "inconveniently relocate" those

17  services.  *Id.* at 168.  Affirming the dismissal, the appellate court held, "the disabilities statutes

18  do not guarantee any particular level of medical care for disabled persons, nor assure

19  maintenance of service previously provided."  *Id.*  This is exactly the case here.  Plaintiffs

20  argue that they will have to be transported to other facilities to receive the care they need.

21  There is no evidence that plaintiffs will not receive the care they need, just that it will be at a

22  different location.

23        Plaintiffs also allege a violation of the Unruh Act, codified at California Civil Code

24  section 51.  This law entitles the disabled to equal accommodations in business

25  establishments.  *See* Civ. Code, § 51.  A violation of the Unruh Act may be based on a

26

27  _____
        [8]  "Defendants have purposely targeted for terminated [sic] those services which are most
28  needed by persons with disabilities and are therefore in violation of the ADA."  Complaint (Doc. 1)
        ¶ 57.

_____

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                                          15

1    violation of the ADA.  Because in this case there was no ADA violation, plaintiffs can only

2    maintain an independent Unruh Act violation by proving intentional discrimination.  *See*

3    *Cullen v. Netflix, Inc.* 880 F. Supp. 2d 1017, 1024-25 (N.D. Cal. 2012).  "To prove intentional

4    discrimination there must be allegations of "willful, affirmative misconduct," and the plaintiff

5    must allege more than the disparate impact of a facially neutral policy on a particular group."

6    *Id.*  Here, plaintiffs have no evidence of willful, affirmative misconduct, because it does not

7    exist.  Plaintiffs therefore have no likelihood of succeeding on the merits of this claim.

8         Plaintiffs further allege a violation of Title VI.  The viability of Title VI claims are

9    guided by the same standards as Equal Protection claims.  *See Gensaw v. Del Norte County*

10   *Unified Sch. Dist.*, 2008 U.S. Dist. LEXIS 54732, *11 (N.D. Cal. Apr. 18, 2008).  "Any

11   purported disparate impact discrimination claim is not cognizable, because Title VI does not

12   provide a private right of action for disparate impact discrimination - only for intentional

13   discrimination."  *Partida v. Page*, 2012 U.S. Dist. LEXIS 28064, *6-7 (E.D. Cal. Mar. 2,

14   2012); *Hill v. County of Sacramento*, 2010 U.S. Dist. LEXIS 115097, *14-15 (E.D. Cal. Oct.

15   27, 2010).  Additionally, only recipients of federal funds can be named as defendants in a Title

16   VI action.  *See Rashdan v. Geissberger*, 2011 U.S. Dist. LEXIS 126211, *10 (N.D. Cal. Nov.

17   1, 2011).  Individual defendants and employees of the County cannot be held liable, and

18   therefore this cause of action cannot be maintained against them.  *See id.*

19        Finally, plaintiffs allege a violation of Government Code section 11135, which

20   prohibits discrimination in state funded programs and is the state counterpart to Title VI.  To

21   prevail, plaintiffs must prove "statistical evidence of a kind and degree sufficient to show that

22   the practice in question has caused the exclusion of . . . [plaintiffs] because of their

23   membership in a protected group."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-95

24   (1988).  Plaintiffs cannot prove that here.  *See Darensburg v. Metropolitan Transp. Com'n*,

25   636 F.3d 511 (9th Cir. 2011).  Plaintiffs mistakenly juxtapose the populations served by

26   Doctors Medical Center against those served by the Regional Medical Center.  This

27   juxtaposition is incorrect because two separate entities own the Regional Medical Center and

28   Doctors Medical Center.  The County is not faced with the choice of which hospital to close,

1   because it only owns and operates one, the Regional Medical Center.  And a Federal judge has

2   already ruled that operating that one hospital, in addition to the provision of other health

3   services, is not discriminatory against any protected group. Any discrimination claims

4   concerning the location of the County's Regional Medical Center have already been litigated

5   and rejected.  RJN Exs. B and D.

6          Plaintiffs attempt, but fail, to distinguish *Darensburg v. Metropolitan Transportation*

7   *Commission* from the case at bar.  In that case, plaintiffs comprised a class of racial minority

8   bus riders, a labor union, and a community based organization.  They filed an action for state

9   and federal civil rights violations, alleging that a transportation expansion plan had a disparate

10  impact on minority riders.  The plaintiffs' claimed that a higher percentage of minorities rode

11  buses rather than trains, and alleged that a plan that emphasized rail expansion would

12  discriminate against the bus riders.  *See id.* at 518.  The Ninth Circuit held that plaintiffs failed

13  to establish a prima facie case because their statistical evidence was unsound and their claim

14  rested "upon a logical fallacy."  *Id.* at 520.  The Court held that "no court could possibly

15  determine whether MTC's long-term expansion plan will help or harm the region's minority

16  transit riders."  *Id.* at 521.  The faulty syllogism in *Darensburg* is the same here: (1) a large

17  percentage of minorities obtain services from Doctors Medical Center; (2) fewer services will

18  be provided at Doctors Medical Center; (3) thus, minorities will be adversely affected.  *See id.*

19  at 520.  Just as the statistics in *Darensburg* said nothing about ridership of future expansions,

20  the statistics cited by plaintiffs here say nothing about health care services at facilities other

21  than Doctors Medical Center.

22         The primary case relied upon by plaintiffs can be distinguished.  In *Rodde v. Bonta*, the

23  hospital that was about to close, Rancho Los Amigos, was one of six County hospitals. 357

24  F.3d 988, 990 (9th Cir. 2004).  Again, a key difference between that case and this one is that a

25  single public entity was changing its public services, which is not the situation here.  Prior to

26  its proposed closure of Rancho, Los Angeles County had consolidated its services for severe

27  disabilities to Rancho.  Because of its unique characteristics, if Rancho closed, the services it

28  provided would not be available within the entire Los Angeles County, and those services

---

1   were for the severely disabled.  *See id.* at 991, n. 3.  In *Rodde*, the County decided to close

2   Rancho because of *anticipated* future budget deficits.  In fact, due to an influx of funding, the

3   expected shortfall was several years after the impending closure and litigation.  *See id.* at 992.

4   The County had a surplus at the time of the litigation.  *See id.* at 999.

5       *Rodde* has no relation to the present action; none of the facts in *Rodde* are present in the

6   case at bar.  The District, not the County, owns and controls Doctors Medical Center.

7   Significantly, the injunction granted in *Rodde* was not against the defendant state director

8   because "the state lacked the right to close Rancho and had not threatened to do so."  *Id.* at

9   993, n.7.

10   **B.    Plaintiffs Have Not Established That They Will Likely Suffer Irreparable Harm.**

11       A plaintiff seeking a preliminary injunction bears the burden of "establish[ing] that

12   irreparable harm is *likely*, not just possible."  *Center for Food Safety v. Vilsack*, 636 F.3d 1166,

13   1172 (9th Cir. 2011) (internal quotation marks and citation omitted) (emphasis in original).

14   Where, as here, a plaintiff seeks a mandatory injunction, the plaintiff must clearly meet this

15   burden.  *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).  A mandatory

16   injunction must also not be "granted unless extreme or very serious damage will result[.]"

17   *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)

18   (internal quotation marks and citation omitted).

19       The irreparable harm alleged by the plaintiffs is speculative.  Of the nine plaintiffs, four

20   are medical doctors, one is a nurse, and four have chronic illnesses.  Complaint (Doc. 1),

21   ¶¶ 13-21.  Plaintiffs allege that the four doctors and the nurse will suffer irreparable harm

22   because their patients will be harmed.  Complaint (Doc. 1), ¶¶ 17-21.  To be harmed, a

23   plaintiff must be harmed directly.  *See Stormans. Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir.

24   2009), *citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167,

25   180-81 (2000) [to have standing, injury must be concrete and particularized, and actual or

26   imminent, not conjectural or hypothetical].  The doctors and nurse will not be harmed directly.

27       Of the remaining four plaintiffs, each has a chronic illness, but they have not

28   established that the alleged irreparable harm is likely to result if the relief they are seeking is

---

COUNTY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No.  C14-03636 WHO                                                                 18

1  not granted.  Complaint (Doc. 1), ¶¶ 13-16.  The plaintiffs seek a preliminary injunction that

2  would prevent the District from closing the Doctors Medical Center's STEMI Cardiac Unit

3  and prevent the West Contra Costa Healthcare District from capping Doctors Medical Center's

4  inpatient beds to a maximum of 50.  But the plaintiffs cannot show evidence of irreparable

5  harm in the proposed closure of the STEMI unit or reduction in beds to Medi-Cal or Section

6  17000 populations.  There is no evidence to show that the 400 people who belong to the

7  Section 17000 population, all of whom are minors, have used or will ever need to use the

8  Doctors Medical Center's STEMI unit.  And even if they did, those services are provided at

9  other facilities and paid for through CCHP.  Plaintiffs have not produced evidence that CCHP

10  members or those served by BHC program have been turned away from other facilities that

11  contract with the County.

**C.    Plaintiffs Have Not Demonstrated that the Balance Of Equities Favors Plaintiffs.**

13          A plaintiff seeking a mandatory preliminary injunction must clearly establish that the

14  balance of equities tips in the plaintiff's favor.  *See Winter*, 555 U.S. at 20; *Stanley*, 13 F.3d at

15  1320.  This balancing requires the district court to weigh "the effect on each party of the

16  granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  While applying this

17  test, the district court must consider whether a plaintiff's requested relief would adversely

18  affect the rights of non-parties or the public at large.  *See id.* at 26.

19          The plaintiffs apparently would have the Court direct the County to "'reorganize its

20  health care system.'"  TRO Motion, 18:27.  A reorganization that would presumably include

21  an injunction forcing the County to take over Doctors Medical Center as a County hospital,

22  without funding to do so, would cause a tremendous injury to the County, and the public it

23  serves.  Since 2006, the hospital has had an operating deficit of $18 million per year.  *See*

24  Godley Dec., ¶ 16. This is more than a budgetary issue.  *See e.g., M.R. v. Dreyfus*, 697 F.3d

25  706, 738 (9th Cir. 2012) ["State budgetary considerations do not therefore, in social welfare

26  cases, constitute a critical public interest that would be injured by the grant of preliminary

27  relief."].  The County's health system budget is currently operating under a $20 million dollar

28  deficit.  *See* Walker Dec. ¶ 4.  Even if such a thing were legally possible, which it is not, it

---

1   would be beyond inequitable to require that the County assume another $18-20 million a year

2   in debt to keep Doctors Medical Center open at the expense of other County  programs, many

3   of which serve the same populations that make up the plaintiffs' proposed class, including

4   medical services at other locations in the County.

5        The County provides comprehensive medical services to its residents.  These services

6   include public health and mental health services; the Contra Costa Health Plan, which provides

7   approximately 148,000 people with comprehensive health coverage – mostly Medi-Cal

8   coverage; and a full service county hospital, the Regional Medical Center in Martinez,

9   California.  In addition, the County's health care system includes a network of ambulatory care

10  health centers (sometimes referred to as clinics), which are licensed outpatient departments of

11  the hospital.  These local health services are located throughout the County.  These local health

12  centers provide basic outpatient medical services and are an integral part of the County's

13  health care delivery system.  Walker Decl., ¶ 5.  All of these comprehensive medical services

14  would be harmed if the plaintiffs obtain their requested relief.

15  **D.      Plaintiffs Have Not Demonstrated that the Public Interest Favors Plaintiffs.**

16       In determining whether to issue a preliminary injunction, the district court must weigh

17  in its analysis the public interest implicated by an injunction.  *See Stormans, Inc.*, 586 F.3d at,

18  1139, *citing Winter,* 555 U.S. at 20.  When the reach of an injunction is narrow, limited only to

19  the parties, and has no impact on non-parties, the public interest will be at most a neutral factor

20  in the analysis rather than one that favors granting or denying the preliminary injunction.  *See*

21  *id.*, *citing Bernhardt*, 339 F.3d at 931.  If, however, the impact of an injunction reaches beyond

22  the parties, carrying with it a potential for public consequences, the public interest will be

23  relevant to whether the district court grants the preliminary injunction."  *Stormans, Inc.*, 586

24  F.3d at 1139, *citing Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir.

25  2002) *and Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1126 (9th Cir.

26  2008).  When an injunction will adversely affect a public interest, the court may in the public

27  interest withhold relief until a final determination of the rights of the parties, though the

28  postponement may be burdensome to the plaintiff.  *See Weinberger v. Romero-Barcelo*, 456

1   U.S. 305, 312-13 (1982) ["Courts . . . should pay particular regard for the public consequences

2   in employing the extraordinary remedy of injunction."] .

3        Moreover, the district court must give due weight to the serious consideration of the

4   public interest that has already been undertaken by the responsible government officials in

5   addressing the issue that is before the court.  *See Stormans, Inc.*, 586 F.3d at 1139, *citing*

6   *Golden Gate Rest. Ass'n*, 512 F.3d at 1127 and *Burford v. Sun Oil Co*., 319 U.S. 315, 318

7   (1943) ["[I]t 'is in the public interest that federal courts of equity should exercise their

8   discretionary power with proper regard for the rightful independence of state governments in

9   carrying out their domestic policy.'"]; *see also San Ysidro Irrigation Dist. v. Superior Court of*

10  *San Diego County*, 56 Cal. 2d 708, 719 (1961) [courts do not enjoin public officers or

11  municipal corporations from acting unless they are acting or proposing to act in excess of their

12  jurisdiction and without authority, and "courts may not interfere with legislative or

13  discretionary functions of a municipal body as distinguished from ministerial acts"].

14       Here, the plaintiffs seek a preliminary injunction that would prevent the District from

15  closing the Doctors Medical Center's STEMI Cardiac Unit, prevent the District from capping

16  Doctors Medical Center's inpatient beds to a maximum of 50, and prevent the County from

17  diverting ambulances from Doctors Medical Center's Emergency Department  to other hospital

18  emergency rooms.  As explained above, the District is a distinct legal entity separate from the

19  County.  The District is the only entity responsible for determining whether its STEMI Cardiac

20  Unit should remain open and the number of inpatient beds that should be at Doctors Medical

21  Center.  The County is not responsible for either of these functions.

22       The County is, however, responsible for directing ambulances to hospitals that are best

23  equipped to provide emergency care.  An injunction that would prevent the County's EMS

24  Agency from directing ambulances to fully-staffed hospitals that are able to provide high-

25  quality emergency care would not prevent harm to Plaintiffs.  Indeed, it would likely lead to

26  types of harm Plaintiffs allege in their Complaint.  Such an injunction would also interfere

27  with this important discretionary function of the County.

28

1   The County EMS Agency has the expertise to determine where patients should be sent
2   by ambulance to receive the best available care. *See* Frost Dec. ¶¶ 1-3 and 11.  The County
3   has been planning for a potential reduction of services at Doctors Medical Center for many
4   years.  Even before it became medically necessary to redirect ambulances away from Doctors
5   Medical Center, the EMS Agency had developed a contingency plan to address a downgrade to
6   the Doctors Medical Center Emergency Department.  Frost Dec. ¶ 11.  The plan called for,
7   among other things, notifying all ambulance providers, fire districts and agencies, and EMS
8   agencies; updating the destination policies and procedures; requesting additional ambulances
9   to be on standby; and continuing to follow destination protocols.  Frost Dec. ¶ 12.  This plan,
10  designed to limit any effect that diverting ambulances from Doctors Medical Center might
11  have on patient care, has worked.  For patients identified as trauma, pediatric critical medical,
12  stroke, psychiatric, or STEMI patients, there have been no reports of adverse outcomes to
13  those patients that are attributable to the redirection of ambulances away from Doctors
14  Medical Center to other receiving hospitals.  Frost Dec., ¶ 14-20 and 24.  Asking this Court to
15  overrule the judgment of medical professionals and, in essence, assume responsibility and
16  judicial oversight of the County EMS Agency is not in the public interest.

### V.  CONCLUSION

17
18  The reduction of services at Doctors Medical Center is both unfortunate and inevitable.
19  Over the past decade, health care providers throughout the region have worked to try to keep
20  the hospital open and assist the hospital in providing a constant level of service.  For its part,
21  even though it had no legal obligation to do so, Contra Costa County entered into several
22  complex financial transactions with the West Contra Costa Healthcare District, a separate legal
23  entity, in an effort to help the County's last independent public healthcare district keep its
24  hospital open.

25  But fundamental changes in the way the nation as a whole provides health care have
26  resulted in a structural operating deficit at Doctors Medical Center.  This structural deficit will
27  not disappear but will only get worse over time.  Stopgap measures cannot solve this problem.
28  Nor can a preliminary injunction.

1       The preliminary injunction sought by the plaintiffs will not preserve the status quo.

2   Instead, it would reverse the status quo.  The status quo now is that the District has closed the

3   hospital's STEMI Cardiac Unit to emergency ambulance traffic and capped the number of

4   inpatient beds at 50, and the County no longer sends ambulances to the hospital's emergency

5   room.  The injunction sought by plaintiffs would force the District to reopen the STEMI Unit

6   to ambulance traffic and lift the bed cap, and force the County to send ambulances back to an

7   understaffed hospital.  The County and other health care providers in the region have been

8   planning for the reduction of services at Doctors Medical Center for years now.  Plans and

9   protocols – developed with the expertise of health care professionals and with patient safety

10  their utmost concern – are in place and being implemented.  A preliminary injunction to

11  reverse the status quo would interfere with these plans and protocols, resulting in unforseen

12  consequences and possibly jeopardizing patient safety.

13      For all of these reasons, the plaintiffs' motion for a preliminary injunction must be

14  denied.

15    DATE: August 19, 2014           SHARON L. ANDERSON
16                             COUNTY COUNSEL

17

18                              /S/
19                              SHARON L. ANDERSON
                             County Counsel
20                              Attorneys for County Defendants
                             JOHN GIOIA, WILLIAM WALKER,
21                              CANDACE ANDERSEN, MARY PIEPHO,
                             KAREN MITCHOFF, FEDERAL GLOVER
22                              and CONTRA COSTA COUNTY

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATE:  August 19, 2014                        SHARON L. ANDERSON
                                               COUNTY COUNSEL


                                    By: _____/S/_____
                                            MONIKA L. COOPER
                                            Assistant County Counsel
                                            Attorneys for County Defendants
                                            JOHN GIOIA, WILLIAM WALKER,
                                            CANDACE ANDERSEN, MARY PIEPHO,
                                            KAREN MITCHOFF, FEDERAL GLOVER
                                            and CONTRA COSTA COUNTY