1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5   DMC CLOSURE AVERSION CTTEE, et          Case No.  14-cv-03636-WHO
    al.,

6              Plaintiffs,

7         v.                                **ORDER DENYING MOTION FOR A**
                                            **PRELIMINARY INJUNCTION**
8   JOHN GOIA, et al.,                      Re: Dkt. No. 3

9              Defendants.

10                              **INTRODUCTION**

11        Doctors Medical Center, an acute care hospital in the western part of Contra Costa County

12   (West County), is closing.  West County has a significantly higher proportion of African

13   Americans, poor, and elderly people than the rest of the County, and it is undisputed that DMC's

14   closing will have an adverse impact on the patients who sought its services.  The plaintiffs seek an

15   injunction to reverse the reduction of services that has occurred at DMC since August 7, 2014.  I

16   must evaluate whether there is a serious question that plaintiffs can prevail on the legal merits of

17   their claims and how to balance the harm of what has happened to date against the harm that a

18   mandatory injunction would cause.

19        On the record before me so far, it appears that the reason DMC is closing is that the

20   residents of defendant West Contra County Healthcare District failed to pass a parcel tax measure

21   in May, 2014 by the necessary two-thirds vote, leaving the District with insufficient funds to

22   support the hospital.  It has an operating deficit of $20 million annually.  During the past twenty

23   years, the District has filed for bankruptcy, allowed a for-profit company to run DMC, received

24   infusions of money from the County and neighboring hospitals, and passed two parcel tax

25   measures in an effort to maintain its services.  These efforts speak to the importance of DMC to

26   the provision of health care in West County.  But they are also proof that the failure of the parcel

27   tax measure in May 2014 is the immediate cause of the closing of DMC.

28        The plaintiffs' discrimination claims are unlikely to succeed.  The District has only one

United States District Court
Northern District of California

hospital – DMC – so by its decision to close DMC it is not discriminating against anyone. Its decision does not benefit one group over another. This is not to say that the impact will not be felt more painfully by the minority, low income, and elderly patients that use DMC's services, but it precludes a showing of intent to discriminate against the District. And since the decision to close DMC was the District's, not Contra Costa County's, claims against the County for closing the hospital cannot prevail. While plaintiffs argue that the County is the senior partner calling all the shots on this decision, there is no evidence that this is the case. The District has its own Governing Board, and while it has a minority of members who are County officials, there is insufficient evidence of control to hold the County responsible for the District's decision.

There is also insufficient evidence that the provision of health services in Contra Costa County is below the standards set by federal and state law. Plaintiffs provided a number of declarations that speak anecdotally to the impact of the loss of services at DMC, but assuming that they have standing to raise these issues, they have not been able to amass sufficient evidence to date to suggest that the County is not complying with the law.

Finally, while I recognize the impact caused by the loss of services at DMC, I am not convinced that the mandatory injunction sought by plaintiffs would cause more good than harm. The District is running out of money. DMC will have to close totally by the end of the year, absent an infusion of financial support. If I force DMC to provide services at the level it did prior to August 7, 2014, I would simply hasten the date of its total closure. More to the point, the District has indicated, credibly, that many of its staff have left to find new jobs in light of the impending closure and that even if I enjoined the District as requested by plaintiffs, DMC could not provide all its prior services without violating state and federal law because it would not be able to recruit the necessary trained staff.

I discuss the facts presented by the parties and merits of each claim below in more detail. For the reasons I have just described, I cannot grant the request for a preliminary injunction and it is DENIED. Given the importance of this problem and fluidity of the situation, I will require the District to provide me a status report concerning the services it is providing and any future plans for the use of DMC on October 1, 2014. The County shall also file a status report on that date that

describes how it is addressing the loss of services for West County residents caused by the reduction of services at DMC.

## BACKGROUND

### I. PROCEDURAL BACKGROUND

On August 11, 2012, plaintiffs[1] filed a complaint and request for a Temporary Restraining Order, seeking to prevent Doctors Medical Center (DMC) in San Pablo, California from diverting ambulances from DMC, capping inpatient beds at 50, and closing the specialized Segment Elevation Myocardial Infarction (STEMI) cardiac care unit on August 12, 2014.  Complaint [Docket No. 1] ¶¶ 1, 54.  Plaintiffs allege causes of action for discrimination in violation of Title VI of the Civil Rights Act of 1964 (Title VI), disparate impact discrimination in violation of section 11135 of the California Government Code, violation of the Americans with Disabilities Act (ADA), violation of California Civil Code § 51, violation of the Age Discrimination Act of 1975, violation of the Medicare Act, violation of California Welfare & Institutions Code § 17000, and violation of California Health & Safety Code § 1255.1(a).[2]

The defendants are the West Contra Costa Healthcare District (the District), which owns and operates DMC, and Eric Zell, the president of the District.  Also named as defendants are Contra Costa County (County), William Walker (the Heath Services Director for the County), and five members of the County Board of Supervisors (John Goia, Candace Anderson, Mary Piepho, Karen Michoff, Federal Glover).

I held a hearing on the TRO on August 12, 2014.  Evidence at that time established that in light of insufficient staffing, DMC had already diverted ambulances, capped inpatient beds, and started to reduce services in the STEMI Unit.  *See* Declaration of William Walker [Docket No. 23]; Declaration of Kathy White [Docket No. 24].  I denied the TRO on both the merits and the

---

[1] Plaintiffs are the DMC Closure Aversion Committee; residents of Richmond, California and current or potential patients of DMC (Rodgers, Hunter, Thompson, Vallejo); and doctors and nurses who worked at DMC (Tufail, Morrissey, Carter, Rounds, Bolden).

[2] In their Reply, plaintiffs also ask for leave to amend the complaint to add a claim for violation of the Knox-Keene Act, add the State of California and "responsible" State health officials as defendants, and provide additional factual details of the individual defendants' malfeasance.  The proposed FAC is attached to the Declaration of Pamela Y. Price at Docket No. 51-1.

United States District Court
Northern District of California

1    nature of the injury, concluding that:

> Preserving the status quo would not give the plaintiffs the relief they seek, since the harm they allege has already occurred. There are significant issues of causation--defendants allege that the reduction in services has been prompted by the failure of the voters to approve a bond issue, which means that the hospital will not have adequate funding to remain open for the long term and which has caused many of the necessary hospital personnel to seek other employment. They assert that they would be violating numerous federal and state health and safety requirements if the hospital was compelled to provide services for which adequate staffing did not exist. Further, the theory underlying plaintiffs' merits argument, that Contra Costa County controls the decisions being made by the Healthcare District, has not been shown by the evidence presented to date. While the current deteriorating status of Doctors Medical Center clearly has an adverse impact on the community it serves, at this preliminary stage of the case it is not clear that the fault for that lies with the defendants.

Docket No. 22.  I ordered expedited briefing and heard plaintiffs' motion for preliminary injunction on August 27, 2014.

## II.  FACTUAL BACKGROUND

### A.  The District and DMC's History of Financial Distress

DMC, originally known as Brookside Hospital, began operating as an acute care facility in 1954 as the District's only hospital.  Starting in the mid 1990's, it experienced significant financial pressures which have continued until today.  The District has tried several different ways to solve its financial difficulties.  In 1997, it entered into a partnership with Tenet Health, a national, for-profit hospital company, to run DMC.  That agreement foundered in 2004 when Tenet concluded that it was losing too much money to sustain the operation.  The District then sought a parcel tax measure that passed and provided needed funding.  But continued losses led the District to file Chapter 9 bankruptcy in 2006.  After a commitment in 2008 from California Medical Assistance Commission, Kaiser, and John Muir Health collectively to provide $17 million for each of the next three years, the District came out of bankruptcy.  In 2011, the extra funds ran out but a second parcel tax measure was passed to provide support.  A consulting firm concluded that no business model would allow DMC to become self-sufficient, so the District searched for a larger organization with which to merge or be acquired by.  No one has been interested.  Today, DMC is running a $20 million annual operating deficit.  Declaration of Eric Zell [Docket No. 27-2], ¶¶ 14-

4

1   24.

2          The County has participated in the effort to keep DMC open.  In 2006, it agreed to provide

3   $10 million through a transfer to the California Department of Health Services.  At that time, the

4   County and the District agreed to create the DMC Management Authority (Authority), a "joint

5   exercise of powers agency" to provide management support to the District.   Declaration of Patrick

6   Godley [Docket No. 34], ¶¶ 3-5.  That Authority was a separate legal entity from the County and

7   the District, and its membership was comprised of two District members, two members of the

8   County board of supervisors, and two members of the County Health Services Department.  *Id*. ¶

9   5, 7. The Authority existed until 2011 (and oversaw various initiatives that provided additional

10   funds to DMC).

11          After a further $10 million transfer of County funds to assist DMC, in 2011 the District

12   agreed to establish a committee of the District Board (Hospital Governing Body) to provide

13   overall administrative and professional responsibility for DMC.  *Id*. ¶ 11.  The Authority was

14   dissolved and the Hospital Governing Body was required (as part of the transfer of County funds)

15   to include as members a County Supervisor, the County Health Services Director, the County

16   Public Health Director, and the Chief Financial Officer of the County's Health Services

17   Department until the County had received full repayment of the general fund transfers.  *Id*.  While

18   the Hospital Governing Body is legally a part of the District, it is a separate legal entity from the

19   County.  *Id*. ¶ 12.  The plaintiffs contend that even though the JPA was dissolved in 2011, the

20   District and County continue operate DMC as a "joint venture."  MPA in Support of TRO at 3.

21   There is no support for that assertion in the record.

22          Despite the County's financial support, fiscal support from other hospitals, and cost-saving

23   measures implemented by the Authority and the Board, DMC continued to run at a significant

24   deficit.  In 2013, the County gave an additional $9 million transfer to benefit DMC, and another

25   $6 million in June 2014.  *Id*. ¶¶ 14-15.  From 2006 to date, the County transferred over $35 million

26   to the District (or the state) on behalf of DMC, yet since 2006 the District has averaged an annual

27   operating deficit of $18 million.  *Id*.   The County operates a full service acute care county

28   hospital, Contra Costa County Regional Medical Center (RMC), located in Martinez, California.

United States District Court
Northern District of California

1    The County Administrator, David Twa, declares that given the current budget situation the County

2    "cannot afford to fund or acquire Doctors Medical Center."  Declaration of David Twa [Docket

3    No. 35].

4        The District relies on the Declaration of Eric Zell (a member of the Board of Directors of

5    the District), who explains the financial issues faced by DMC, including the fact that 77% of

6    DMC's patients are "government pay" for which DMC is not reimbursed the full cost of care and

7    that DMC cannot shift these costs to commercially/HMO insured individuals because only 12% of

8    DMC's patients have commercial/HMO insurance.  Zell Decl. ¶¶ 4, 6.  Zell explains that at the

9    end of 2013/beginning of 2014 a parcel tax was placed on a mail-only ballot election held on May

10   6, 2014.  The parcel tax would have covered most of DMC's operating loses.  *Id.* ¶ 25.  That

11   measure failed to secure the two-thirds vote needed for passage.  *Id.* ¶ 26.  Zell expects that before

12   the end of 2014, DMC will need to close as a full-service acute care hospital and "hopefully"

13   reorganize into "a different sort of healthcare provider."  *Id.* ¶ 28.

14       Plaintiffs note that emergency legislation is pending in the California legislature that would

15   provide emergency funding of about $3 million to DMC.  Reply at 2; Proposed FAC [Docket No.

16   51-1], Exs. 11& 12.  At the hearing, plaintiffs also expressed hope that additional funding could be

17   secured (as it has in the past) from other regional hospitals, from money Chevron is negotiating to

18   provide in a Community Benefits Agreement with the County (in exchange for County approval

19   of its modernization plans), and that a "political solution" to keep DMC open could be reached.

20   *See, e.g.,* Proposed FAC, ¶ 32 (discussing Chevron proposed CBA).

21   **B. DMC's Patients**

22       Plaintiffs allege that the population served by DMC is largely African American, senior

23   citizens, and indigent persons.  *Id.* ¶ 2.   This population has "elevated" rates of chronic, life-

24   threatening problems such as heart disease, diabetes, cancer, and asthma.  Declaration of Otis E.

25   Rounds [Docket No. 5] ¶ 4; Declaration of Ellen C. Morrissey [Docket No. 7] ¶ 3; Declaration of

26   Sharon B. Drager [Docket No. 8] ¶ 2.

27       Plaintiffs note that Contra Costa County has already concluded that DMC's plan to divert

28   ambulances, close the STEMI unit, and cap inpatient services to 50 beds, "will be catastrophic to

6

1    residents of West Contra Costa County (West County)" as DMC is "one of only two hospitals in

2    the region" and the only hospital in the West County with a STEMI program.  The County EMS

3    concludes that downgrading or eliminating emergency services "will result in increased morbidity

4    consequences for the community."  Compl.¶ 1; Ex. 1 at 3-4.

5        **C.  DMC's Loss of Staff and Reduction of Services**

6             DMC argues that it had to divert ambulances, cap inpatient beds, and close the STEMI unit

7    because staff departures made it unsafe to continue those operations/services.  The District relies

8    on the declaration of Dawn Gideon, the Interim CEO of DMC (and an employee of Huron

9    Consulting Group, a firm specializing in providing clinical and financial performance

10   improvement, restricting, and closure advisory services to hospitals).  Declaration of Dawn

11   Gideon [Docket No. 27-1] ¶¶ 1-2.[3]  The Gideon declaration tracks the Zell Declaration with

12   respect to the financial history and current situation of DMC.  She explains that, anticipating the

13   possible rejection of the bond measure in May 2014, DMC began proceeding on three

14   simultaneous tracks: (a) preparing for closure of DMC as an acute care hospital; (b) searching for

15   funding to keep DMC open as a full-service acute care hospital; and (c) looking at healthcare

16   services the District could offer after DMC's closure.  *Id*. ¶ 6.  Gideon declares that on April 15

17   and April 22, 2014, the District notified the County's Department of Health Services Emergency

18   Medical Services Division (EMS) and the California Department of Public Health (CDPH) of

19   DMC's intent to close the hospital's Emergency Department as of July 25, 2014.  *Id*. ¶ 7, Ex. 1.

20   Gideon admits that DMC since notified CDPH that the July 25, 2014 closure date was "changing,"

21   but contends that DMC did not rescind the notice.  *Id*.

22             Gideon explains that following the announcement of the closure of the ED, and given the

23

24   ─────────────────────

3  Plaintiffs attack Gideon's credibility.  In a declaration submitted in support of the Reply, Gail
25   Thomas, the President of the Palm Drive Health Care Foundation (PDHCF), a non-profit created
     to help save Palm Drive Hospital in Sonoma County, explains her experiences with Gideon's
26   "tactics" and "irregularities" in closing hospitals, as well as Gideon's belief (according to Thomas)
     that small hospitals cannot survive in the current climate.  Docket No. 55.  Defendants object to
27   the Thomas Declaration on relevance and lack of personal knowledge.  I agree that the Thomas
     Declaration has little to no relevance as it does not provide sufficient facts regarding the alleged
28   similarities between DMC and Palm Drive Hospital or Gideon's approach there as opposed to in
     her role as Interim CEO here.

United States District Court
Northern District of California

United States District Court
Northern District of California

well-known financial condition of DMC, nurses and doctors (particularly specialized staff) began to terminate their employment, causing the District to have to adjust its prospective closing timeframes in order to ensure patient safety.  *Id.* ¶ 12.  As an example, Gideon cites the notice provided by the California Emergency Physicians group (which contracts with DMC to provide physician staffing for the hospital ED) that it would be terminating its contract effective November 13, 2014.[4]  *Id.* ¶ 13.  Gideon also asserts that DMC did not have adequate staffing of ICU nurses and telemetry nurses, even after DMC sought to hire specialty nurses from registry or travel services.  *Id.* ¶ 14.  Gideon contends that DMC cannot use too many registry or travel nurses because CDPH "insists" that a large proportion of the specialty nursing staff be employed full-time at DMC.  *Id.*  She concluded, "With the rate of attrition DMC was experiencing, it was obvious that we could not hope to staff the ED much longer."  *Id.*

In mid-July 2014, Gideon spoke with EMS and started conversations with DMC ED medical staff leadership regarding the ED physicians' request that EMS officials discontinue 911 emergency ambulance transports to DMC.  *Id.* 15.  It was agreed to stop ambulance transports effective August 12, 2014, but ED staff concerns about patient wait times, concerns from ambulance transport provider (American Medical Responses) about off-loading wait times, and concerns from other ERs in the area about acute patients being transferred from DMC (with suggestions that those patients should be sent to the other ERs in the first instance), led to the diversion of ambulances on August 7, 2014.  *Id.* ¶ 16.

DMC's inpatient bed capacity is likewise a moving target according to Gideon.  Due to staff attrition, DMC can only determine the number of available beds on a shift-by-shift basis to comply with state and federal regulations regarding patient care.  According to Gideon, the number of beds "will vary over time but will inevitably be declining."  *Id.* ¶ 18.  That question has

---

[4] In Reply, plaintiffs submit the declaration of Colin Mbanugo, the Chief of Surgery at DCM.  On August 24, 2014, he informed Gideon that the General Surgery ER Coverage panel has agreed to resume ER General Surgery call coverage, and that "will of course mean that you do not have to have the ER on standby status."  Declaration of Colin Mbanugo [Docket No. 42] ¶ 2.  However, as explained at the hearing, surgeons are called into the ED to perform surgery by ED doctors; it was the lack of sufficient ED doctors (and nurses) that caused the ambulance diversion as of August 7, not the lack of surgeons who could work in the ED.

1   become more acute because the hospitalist group has given DMC notice that they intend to

2   terminate their contract with DMC effective October 14, 2014.  *Id*. ¶ 19.   Gideon concludes by

3   describing the planned termination of staff (e.g., billing clerks, radiologists) and additional

4   services (physical therapy, occupational therapy, cardiac rehabilitation outpatient services) that

5   will take place over the next few months. *Id*. ¶¶ 20-22.

6           Plaintiffs challenge the District's position that it had to divert ambulances, cap inpatient

7   beds, and close the STEMI because of staff departures that were outside of the District's control.

8   Plaintiffs claim that defendants created the situation by announcing in May 2014 the likely closure

9   of DMC (thus forcing staff to start looking for other jobs), and by refusing to allow nurses

10  (including specialty ED and STEMI nurses) to work per diem to help to continue to provide

11  services at DMC.  Plaintiffs rely on the declaration of Amy Johnson, an Emergency Room RN

12  who worked with patients in the STEMI unit.  Johnson Declaration [Docket No. 41] ¶ 2.  Johnson

13  declares that between May/June 2014 (when she gave notice) and July 9, 2014 (when she left

14  DMC) she offered to continue to work as a Per Diem RN on an as-needed basis but the ER

15  manager, Andra Kaminsky, told Johnson that Per Diem positions were not being offered.   *Id*. ¶¶

16  5-6.  Johnson says that DMC's claims that it had to divert ambulances because of lack of staff are

17  not true based on her experience (as of July) because there were sufficient nurses who wanted to

18  continue providing care.  *Id*. ¶ 7; *see also* Declaration of Lisa Vajgrt-Smith [Docket No. 47], ¶¶ 4-

19  7 (she expressed her willingness to work per diem through June 21, but was denied); Declaration

20  of Traci Miller [Docket No. 49] (same, told on June 6 by Kaminsky that hospital was not letting

21  "anybody go Per Diem.").

22          Another nurse, Maria Del Rosario Sahagun declares that "several" nurses offered to work

23  per diem shifts, including Johnson (through early July), Lisa Francisco (though July 4), and Albert

24  Bradley (through July 15) but they were "refused."  Declaration of Maria Del Rosario Sahagun

25  [Docket No. 46] ¶ 3.[5]  Sahagun states that within the last week, six per diem shifts were offered.

26

27  _____
    [5]  Defendants object to the Sahagun declaration to the extent she "was informed" of facts by others
28  and, therefore, lacks personal knowledge.  For purposes of the preliminary injunction motion, the
    objections are overruled.

United States District Court
Northern District of California

1    *Id.* Ms. Sahagun also states that she is aware that other nurses have had their shifts called off or

2    otherwise told not to report to work. *Id.* ¶ 4.

3       However, no ED nurses testify that they offered and were denied the opportunity to work

4    per diem in late July and early August (when the ED was closed to ambulances) and there is no

5    evidence that *sufficient* numbers of ED doctors *and* nurses were available and willing to work

6    during late July/early August to keep the ED open. Moreover, as noted above, heavy use of non-

7    full time nurses for the ED and STEMI was not a solution in light of CDPH concerns. Gideon

8    Decl. ¶ 14.

9       **D.   Impact of DMC's Reduction of Services**

10      Plaintiffs argue that the reduction of services has already had severe impacts on West

11   County residents and the EDs of area hospitals. Plaintiffs submit declarations from nurses and

12   doctors alleging that since the diversion of ambulances started at DMC, other EDs have become

13   overcrowded, patients have been impacted, and some have likely died as a result of having to

14   travel farther for medical care and/or having to wait longer at the more-crowded emergency

15   rooms. For example, Anne Stewart, a labor representative for the California Nurses Association,

16   declares that through her own personal observations and discussions with nurses on August 21,

17   2014 at the Alta Bates Summit Medical Center's (ABSMC) Berkeley campus, there was a

18   significant increase in walk-in patients (from as far away as North Richmond), ambulance traffic,

19   and emergency surgeries due to the reduction of services at DMC. Anne Stewart Declaration

20   [Docket No. 43] ¶¶ 1-5.[6] The consequence (on August 20th and 21st) was a full ED, ambulances

21   "lined up," and patients on gurneys in the hallways. *Id.* ¶¶ 6-7.

22      Stewart learned from conversations with nurses that on August 20, 2014, a critical patient

23   from Richmond suffering from kidney/renal issues had to wait 30 minutes to be seen by staff at

24   the Ashby ED, coded at least three times in the Ashby ED because dialysis was needed but there

25   was insufficient staff, and then died that afternoon. *Id.* ¶¶ 10-12; *see also* Declaration of Paraskevi

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6] Defendants object to significant portions of the Stewart Declaration as inadmissible hearsay and

28   lack of personal knowledge. Docket No. 59. For purposes of the motion for preliminary injunction, those objections are overruled.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Theocharis [Docket No. 48] (describing increased pressure DMC's ambulance diversion has

2   placed on ABSMC Oakland's STEMI unit and ED, and the fact that Alameda EDs can no longer

3   divert when their capacity is reached); Declaration of Herschel Lanier [Docket No. 50] (describing

4   "remarkable" impact of DMC ambulance diversion on Kaiser Richmond ED; 30-40 additional

5   patients per day; and Kaiser is now receiving myocardial infarctions, which they used to send to

6   DMC and now have to send by ambulance transport to Kaiser Vallejo); Declaration of Jenn

7   Sivagnanalingam [Docket No. 53] (declaring that ABSMC at Berkeley ED has seen a steep

8   increase in patients including acute patients and ambulance traffic, creating a lack of space and

9   time to treat patients); Supplemental Declaration of Humayun Tufail [Docket No. 44] ¶¶ 3-6

10  (relying on a study finding that patients admitted to a hospital located near a hospital with a

11  closure had a 5% higher chance of inpatient mortality).[7]

12          Plaintiffs also focus on the impact the closure of the STEMI unit will have on residents,

13  submitting evidence that given the distances from San Pablo to the closest STEMI units (John

14  Muir Medical Center in Concord and Alta Bates Summit Medical Center in Oakland), residents

15  will suffer significant delays in receiving emergency cardiac treatment and those delays will result

16  in higher mortality.  Declaration of Robert M. Greene [Docket No. 40] ¶¶ 6-9.[8]

17          Finally, plaintiffs assert that another death has been caused by the reduction of services at

18  DMC.  Dr. Otis E. Rounds (a doctor affiliated with DMC) states that on August 26, 2014, an ill

19  elderly woman asked her friend to take her to DMC after being told by an ambulance driver that

20  there would be a two hour wait at Kaiser Richmond.  Docket No. 60.  The woman was

21  unresponsive and unconscious on her arrival, was resuscitated, but coded repeatedly, and died.  *Id.*

22  ¶¶ 2-5.  At the hearing, defendants objected to Dr. Rounds' declaration, arguing that there is no

23

24  _____

25  [7] Dr. Tufail also noted that he is the Medical Director of the CEP Hospitalists Group, has offered
    to work with DMC to find staffing solutions, and has told DMC that if the "hospital remains open"
    his group will rescind their notice.  *Id.* ¶ 7.  Defendants object to the portions of the Supplemental

26  Tufail declaration discussing an article from "Health Affairs" regarding increased morbidity and
    mortality from hospital closures as improper lay and expert opinion and hearsay.  For purposes of

27  the motion for preliminary injunction, the objections are overruled.
    [8]  Defendants object to the Greene Declaration to the extent he relies on two articles as improper

28  lay and expert opinion in violation of Federal Rule of Evidence 702.  For purposes of the
    preliminary injunction motion, the objections are overruled.

United States District Court
Northern District of California

1    evidence (at this point) to support the conclusion that this patient's death is related to the reduction

2    of services at DMC.

3        The County's Director of Emergency Medical Services, Patricia Frost, discusses the steps

4    she took after being notified by DMC of the intended closure of emergency services,

5    implementing the County EMS's contingency plan that had been developed and removing DMC

6    from the list of hospitals that could receive emergency ambulance traffic.  Declaration of Patricia

7    Frost [Docket No. 33] ¶¶ 7-12.  Frost declares that the ambulance redirection from DMC has

8    resulted in no adverse outcomes to STEMI, stroke, psychiatric, trauma, or pediatric critical

9    medical patients.  *Id*. ¶ 24.

10       In a Supplemental Declaration, Frost submits evidence comparing the average patient hand

11   off times from ambulances to the area ED departments both prior to the DMC diversion and in the

12   three weeks after the diversion started.  That evidence shows handoff times remained relatively

13   constant after the DMC diversion.  Supplemental Declaration of Patricia Frost [Docket No. 61],

14   Ex. C.  The County, however, does not counter or submit evidence to show that the EDs in the

15   area have not experienced significant increases in ED patients as a result of the DMC diversion.

16       The County, through the Chief Financial Officer of the County's Health Services

17   Department, Patrick Godley, contends that while the County has recognized that DMC is a

18   "critical component of the County's Emergency Medical Services system" (*see, e.g.*, County RJN,

19   Ex. K[9]) "none of the actions taken by the Health Services Department of the County to try and

20   help [the District] keep its hospital open had anything to do with helping the County fulfill its

21   legal obligations to provide indigent medical care to its residents."  He argues that the County's

22   compliance with its legal obligations to provide indigent care will not be affected if DMC closes.

23   *Id*. ¶ 19.

24                                   **LEGAL STANDARD**

25       A preliminary injunction is an extraordinary remedy, that should be granted only where a

26   plaintiff can establish "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer

27

28   _____
     [9] The Court GRANTS the County's requests for judicial notice.

1   irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his

2   favor, and (4) and that an injunction is in the public interest." *Toyo Tire Holdings of Ams., Inc. v.*

3   *Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. NRDC*, Inc., 555 U.S.

4   7, 20 (2008)); *Winter*, 555 U.S. at 22.   Alternatively, a preliminary injunction may issue where

5   there are "serious questions" going to the merits and the balance of hardships tips "sharply" in

6   plaintiff's favor.  *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127,1131-32 (9th Cir.

7   2011).

8        A mandatory injunction, which goes beyond simply preserving the status quo and forces a

9   party to do more, is "particularly disfavored" and should be denied "'unless the facts and law

10   clearly favor the moving party.'"  *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir.

11   1994).

**DISCUSSION**

**I.  LIKELIHOOD OF SUCCESS ON OR SERIOUS QUESTIONS ABOUT THE MERITS**

**A.  County and District are Separate Legal Entities**

15        Initially, I must address plaintiffs' continued assertion that the County and District –

16   because County representatives are on the Hospital Governing Body of the District – are one and

17   the same.  They are not.  Plaintiffs do not dispute that the Hospital Governing Body and the

18   County are legally distinct entities.   Nor do plaintiffs dispute that a county can only act through a

19   majority vote of the members of its board of supervisors.  *See* Cal. Govt. Code. § 25005.  Instead,

20   plaintiffs argue that because four of the eleven seats on the Governing Body are specified

21   representatives of the County, the County has effective control over the Board.[10]  Plaintiffs note

22   that the Body's bylaws provide that a quorum is six members, and argue that the four County

23   representatives, therefore, could constitute a majority of quorum; presumably if seven of the non-

24   County representatives did not show up to a meeting and all four County representatives did.  Ex

25   12 to Plaintiffs' RJN [Docket No. 52].[11]  The fact that at some theoretical meeting County

26   _____

27   [10] Under California Code of Regulations § 70035, "Governing body means the person, persons,
     board of trustees, directors or other body in whom the final authority and responsibility is vested
28   for conduct of the hospital."
     [11]  Defendants object to plaintiffs' attempt to request judicial notice of newspaper articles and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    representatives could make up the majority of voting members does not establish the County's

2    control over the Body.

3          Plaintiffs also point to language in the County's property tax transfer agreements (the

4    agreements by which the County gave money to the District in exchange for repayment through

5    parcel taxes) that provides until the District has satisfied its repayment obligations, "it will not

6    amend either of District's Amended and Restated Bylaws or the Governing Body Bylaws, to

7    remove, reduce or impair participation by County Representatives in the Governing Body without

8    the prior written consent of County."  Ex. O to County RJN at 5, ¶ B.  This language, however,

9    simply confirms the County's obvious interest in the operation of the District, in light of the

10   District's financial commitments to the County.  It does not establish that the County *controls* the

11   Body or the District, but simply that its representative have a say (or the right to have a say) at the

12   Governing Body level.

13         Plaintiffs contend that the reason for the County's "oversight and controlling interest" in

14   the District is that the County used DMC as a "surrogate" for County health services in West

15   County.  Reply at 4.  Plaintiffs rely on the Declaration of Ellen Morrissey who states that while

16   there are 3 dialysis units in West County which serve over 350 patients, "None of the Contra

17   Costa County medical facilities provide acute dialysis services for these patients."  Morrissey

18   Decl., ¶ 3.  However, Morrissey does not say that the County does not pay for these services.

19   There is nothing impermissible about the County using clinics or hospitals such as DMC to

20   provide these services in lieu of offering them at the RMC.  Similarly, Sharon Drager declares that

21   in her experience at DMC, "it has been my observation that the West County clinics send their

22   uninsured patients to DMC emergency room."  Drager Decl., ¶ 5; *see also* Tufail Decl., ¶ 6

23   (same).  But, again, that does not mean that the County controls DMC or that it was improper for

24   West County clinics to send uninsured patients to DMC in West County (as opposed to RMC in

25   Martinez) when there are valid reasons to have sent patients to DMC (location, specialty services).

26

27   other media accounts as improper hearsay.  Docket No. 56.  The court agrees and will not take
     judicial notice of the media accounts included in plaintiffs' RJN.  Plaintiffs' RJN is GRANTED in
28   all other respects.

1    In fact, one of the ways the County *supported* DMC was by contracting with it to provide services

2    to its indigent residents.  Walker Decl, ¶ 23.

3        Plaintiffs have not established on this record that the County controls or can control the

4    District.

5    **B. Title VI**

6        Under Title VI of the Civil Rights Act of 1964, no person shall, "on the ground of race,

7    color, or national origin, be excluded from participation in, be denied the benefits of, or be

8    subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. §

9    2000d.  In order to state a claim under Title VI, "plaintiffs must show that actions of the

10   defendants had a discriminatory impact, and that defendants acted with an intent or purpose to

11   discriminate based upon plaintiffs' membership in a protected class." *Comm. Concerning Cmty.*

12   *Improvement v. City of Modesto*, 583 F.3d 690, 702-03 (9th Cir. 2009).

13   **1.      County Liability**

14       Plaintiffs argue that the County's failure to support DMC "on par" with RMC in Martinez

15   means that the County is discriminating against the predominately African American patients of

16   DMC.  Motion at 10-11; Reply at 12.  Plaintiffs ignore the fact, however, that the County does not

17   own or operate DMC.  As explained by the Ninth Circuit in *Darensburg v. Metro. Transp.*

18   *Comm'n*, "'The basis for a successful disparate impact claim involves a comparison between two

19   groups — those affected and those unaffected by the facially neutral policy.'" 636 F.3d 511, 519-

20   520 (9th Cir. 2011) (quoting *Tsombanidis v. W. Haven Fire De''t*, 352 F.3d 565, 575 (2d Cir.

21   2003)).  Here, because the County does not operate and is not legally obligated to operate DMC,

22   comparisons between the patients served at DMC and RMC cannot establish discriminatory

23   impact.

24       Further, there is no authority to argue that because the County has voluntarily supported

25   DMC in the past, it must continue to do so. Nor is there any evidence or allegation that the County

26   has apportioned its general fund distributions in a way that discriminates against protected groups.

27   Plaintiffs do not allege that the County discriminates against African Americans in the services it

28   provides at the County's RMC or that the County has failed to ensure access across all minority

United States District Court
Northern District of California

15

groups to basic health care.

Both sides cite to and rely on *Latimore v. Contra Costa County*, Case No. 94-1257 SBA. In that case Judge Armstrong issued a preliminary injunction stopping work on the County's construction of RMC in Martinez (Central County) based on the argument the County was not providing equal health care services to minority and poor groups based in West and East County. *See* March 27, 1995 Order at 2. Four months later, the Court dissolved the injunction because the County showed that it (i) was providing "equal access" to health care by providing transports to Central County, (ii) increased the availability of hospital services in East and West County, and (iii) developed an educational campaign to inform the public of these services. *Id.* at 4. Plaintiffs argue that during the 20 years since *Latimore*, the brunt of fulfilling the County's commitment to providing equal services for West County "has fallen almost entirely" on DMC. But that assertion is not borne out on the record. As noted in the Walker Declaration, the County has been providing services through many channels in West County, obviously including DMC. Walker Decl. ¶¶ 5-25.

Fundamentally, there is no evidence that the County's provision of health care services – through RMC, the community clinics, through the County's Basic Health Care Program (BHC) and Contra Costa Health Plan (CCHP) – creates unequal services for African American or other protected groups. Plaintiffs may be able to develop that evidence through discovery, but it does not exist in the record on the motion for a preliminary injunction.

### 2.    District Liability

There is no dispute that the District operates only one hospital. There cannot be any disparate impact (or discrimination) when an entity operating only one hospital is forced to (or decides to) close it, because all residents of the District will be affected equally. *See, e.g.*, *Darensburg*, 636 F.3d at 519-520 (requiring a comparison between those affected and those unaffected by the facially neutral policy); *Rodde v. Bonta*, 357 F.3d 988, 997 (9th Cir. 2004) ("across-the-board" cuts do not create discriminatory impact).

On the record before me, plaintiffs have not shown a likelihood of success on the merits or that serious questions go to the merits of their Title VI claim against the County or the District.

1

2       **C.  Government Code § 11135**

3              California Government Code section 11135 prohibits discrimination "under[ ] any program

4       or activity that . . . receives any financial assistance from the state."   The statute allows a cause of

5       action for "disparate impact" discrimination.  In order to determine whether a government action

6       has a discriminatory disparate impact: (1) a plaintiff must establish a prima facie case that the

7       defendant's facially neutral practice causes a disproportionate adverse impact on a protected class;

8       (2) to rebut, the defendant must justify the challenged practice; and (3) if the defendant meets its

9       rebuttal burden, the plaintiff may still prevail by establishing a less discriminatory alternative.

10      *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011).  Plaintiffs allege that

11      the defendants' actions are illegal under § 11135 because of their disparate impact on African

12      American residents of West County.

13             For the same reasons discussed above, neither the County nor the District can be found to

14      have created – by the County's failure to provide further funding for DMC (which it does not own

15      or operate) or the District's decision to reduce services at the only hospital it operates– a disparate

16      impact on protected groups.  Plaintiffs argue in Reply that the closure disparately impacts persons

17      over age 60.  Reply at 12-13.  There may well be an impact on persons over age 60, but it cannot

18      be *disparate* because there is no other, more favored group that either the County or the District is

19      *choosing* to benefit instead.

20             On the record before me, plaintiffs have not shown a likelihood of success on the merits or

21      that serious questions go to the merits of their § 11135 claim.

22      **D.  Americans with Disabilities Act**

23             Plaintiffs argue that because the reduction of services at DMC has and will adversely

24      impact disabled individuals (and result in increased morbidity and mortality) that reduction

25      violates Title II of the ADA.  Plaintiffs point out that a large portion of the patients who receive

26      treatment at DMC suffer from severe impairments including chronic diabetes and cardio-vascular

27      illnesses.  In particular, plaintiffs argue that because DMC is the only STEMI facility serving West

28      County, this case is comparable to *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004).  In *Rodde*, the

*United States District Court*
*Northern District of California*

17

1   Ninth Circuit affirmed an injunction under the ADA preventing Los Angeles County from closing

2   the *only county* hospital that was able to provide services to severely disabled patients.

3       *Rodde* is inapposite to the facts in this case.  First, as noted above, in *Rodde* the plaintiffs

4   sued to prevent the county from closing the only hospital in the county that could serve severely

5   disabled individuals.  Here, there is no evidence that RMC and the other facilities in the area

6   cannot service the critically ill patients identified by plaintiffs.  Moreover, there are other STEMI

7   units in the county and nearby that can and have serviced West County patients, including John

8   Muir Medical Center in Concord and ABSMC Oakland.  Frost Decl. ¶¶ 17, 21, Ex. 1.  Second, the

9   hospital being closed in *Rodde* was one of six in the county, but the only one that could provide

10  services for severely disabled patients.  That "wholesale elimination of services relied upon

11  disproportionately by the disabled because of their disabilities" was sufficient to demonstrate

12  discrimination under the ADA.  *Id*. at 997.  Here, because the hospital is the only one run by the

13  District and is not operated by the County, the discriminatory intent and impact against the

14  disabled is missing.  Third, the District has been and is under a severe budget deficit and there is

15  no evidence that the County could (even if it wanted to) support DMC with its general funds.  *See*

16  Zell Decl.; Twa Decl.  In *Rodde*, while the county used budget constraints to argue it should be

17  allowed to close the hospital, there was evidence that the county had a significant budget surplus

18  ($300 million) and no budget shortfall was likely until three years after the intended closure.  *Id*. at

19  992.[12]

20      On the record before me, plaintiffs have not shown a likelihood of success on the merits or

21  that serious questions go to the merits of their ADA claim.

22

23

---

24  [12]  The County also relies on *Lincoln CERCPAC v. Health & Hosps. Corp*., 147 F.3d 165 (2nd

25  Cir. 1998).  There the Second Circuit rejected an attempt to stop the closure of a clinic serving
    disabled children.  The Court explained that the "closing of CERC is challenged, not because its

26  absence will deprive disabled children of medical service available to non-disabled children, but
    because the closing will eliminate or reduce some services needed by disabled children and will

27  inconveniently relocate at [another site] other services that these children require."  *Id*. at 168.
    That, however, was not a violation of the ADA because the ADA does "not guarantee any

28  particular level of medical care for disabled persons, nor assure maintenance of service previously
    provided."  *Id*.

United States District Court
Northern District of California

United States District Court
Northern District of California

### E.  California Civil Code 51

Under California's Unruh Act, individuals are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments. Plaintiffs assert that because they have alleged an ADA violation, those actions likewise violate California Civil Code § 51.  However, as discussed above, plaintiffs do not demonstrate a likelihood of success or serious questions on the merits of the ADA claim.  Therefore, this claim fails as well.

### F.  Age Discrimination Act of 1975

Defendants argue that plaintiffs did not comply with mandatory notice requirement or exhaust their administrative remedies as required by the statute.  42 U.S.C. § 6104(e), (f).   42 U.S.C. § 6104(e) provides that before an action can be brought under this Act, the complainant "shall give notice by registered mail not less than 30 days prior to the commencement of that action" to the Secretary of Health and Human Services, the Attorney General of the United States, and the person against whom the action is directed.  Under 42 U.S.C. §§ 6104(e) and (f), no action may be filed unless administrative remedies have been exhausted.  Exhaustion occurs "180 days from the filing of an administrative complaint during . . . or upon the day that the Federal department or agency issues a finding in favor of the recipient of financial assistance, whichever occurs first."

In their Reply, plaintiffs allege that an administrative complaint was filed with HHS on May 14, 2014 by the California Nurses Association.[13]  However, under the statute, a claim is not exhausted until 180 days after the administrative complaint is filed or until the HHS denies the claim, whichever occurs first.  Plaintiffs do not allege that either of those triggers has occurred. Therefore, even if plaintiffs could show that the administrative complaint filed by the nurses was broad enough to encompass the claims asserted by plaintiffs here, there is no evidence that that administrative complaint has been exhausted to allow litigation of the Age Discrimination Act claim in this court.  *Marin v. Eidgahy*, 2011 U.S. Dist. LEXIS 64603, *21 (S.D. Cal. June 17,

---

[13]  Plaintiffs do not attach a copy of that administrative complaint to their Reply or supporting declarations.

2011) ("Exhaustion is a prerequisite to filing suit.").

Therefore, based on the record before me, plaintiffs have not shown a likelihood of success on the merits or that serious questions go to the merits of their Age Discrimination claim.

### G. Medicaid Act

Plaintiffs allege that defendants have violated two provisions of the Medicaid Act (42 U.S.C. § 1396 *et seq.*) and their implementing regulations.

- 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.90 – requiring  state medical plans to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."

- 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204 – requiring states to make sure their plans ensure the payments for services are sufficient to get quality care and are sufficient to enlist enough providers so that care available under the plan is at same level as care available to the general population.  The regulations further clarify that it is the "agency's payments" that must be sufficient to ensure enough providers and quality care.[14]

### 1. County Liability

Plaintiffs argue that by diverting ambulances, capping inpatient beds, and closing the STEMI unit the County has and will in the future deny West County Medicare participants "prompt" access to health care and failed in its duty to ensure payments are sufficient to provide quality care and an adequate numbers of providers.

As the County points out, however, the statutes at issue impose requirements on the "state" in the development of its Medicare plans, not on counties.  *See Sanchez v. Johnson*, 416 F.3d 1051, 1054 (9th Cir. 2005) ("The Medicaid Act sets out the requirements for a state plan at 42 U.S.C. § 1396a(a)(1)-(65)."); *see also* 42 U.S.C. § 1396a(a)(5) (requiring states to establish a single agency to administer or supervise the administration of the plan).  There is no support for plaintiffs argument that the requirements in 1396a(a)(8) & (a)(3) – requiring states to implement *plans*,

---

[14] In their motion, plaintiffs also assert that defendants violated two additional regulations: (i) 42 C.F.R. § 438.206(b)(1)(v) – requiring that states "must consider" in establishing "networks" the geographic location of providers; and (ii) 42 C.F.R. § 438.207(b)(2) – requiring states to make their approved plans (MCO, PIHP, PAHPs) submit materials showing that the plans/providers have a network sufficient to meet capacity in their service area.  There is no evidence that defendants (either the County or the District) play any role with the state in "considering" networks or "approving" plans.

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    providing prompt determinations on applications, prompt provision of medical care, and adequate

2    payments – apply to a County who is providing Medicaid services under a state-approved plan.[15]

3            In addition, with respect to 42 U.S.C. § 1396a(a)(30)(A), the Ninth Circuit in *Sanchez* held

4    that there is no private right of action to enforce that provision, even though the plaintiffs were

5    seeking *only* injunctive relief. *Sanchez*, 416 F.3d at 1061.

6            However, even assuming the County could be sued under § 1396a(a)(8), there is no basis

7    in the record to find – at this juncture – that the County is not providing services to Medicaid

8    participants with "reasonable promptness." While plaintiffs have evidence that due to the

9    diversion of ambulances from DMC, individuals have to be transported farther (to EDs at RMC,

10   Kaiser Richmond, one of the ABSMC campuses, etc.) and that those emergency departments have

11   experienced a sharp increase in patients and longer wait times, it is a legal jump (unsupported by

12   the evidence or legal authority) to conclude that the longer wait times experienced in the past three

13   weeks *means* the County is not providing medical assistance with "reasonable promptness."

14   Plaintiffs cite no regulation or case explaining the standards for "reasonable promptness" to show

15   that the situation created by diversion of ambulances from DMC has caused the County to violate

16   a duty under the Medicare Act. Indeed, in the Provider Directory for Contra Costa's Health Plan

17   (CCHP - the plan the State Department of Health Care Services has approved and contracts with

18   under the Medicaid Act), there are numerous health care providers listed in West County.

19   Plaintiffs provide no evidence and make no argument that *any* of these providers are affected by

20   the events taking place at DMC. *See* Pl RJN Exs. 19 & 20.

21

22

---

23   [15] Plaintiffs rely on two cases to support their argument. They are both distinguishable. In the
     unpublished District Court decision in *Rodde v. Bonta*, Case No. 03-1580 (C.D. Cal. May 7,
24   2003), the district court relied upon language in a contract between the County and the state where
     the County agreed to comply with all Medicaid act statutes and regulations. There is no evidence
25   here of a similar contract. Moreover, while the Ninth Circuit affirmed the district court's
     injunction in *Rodde*, it did so solely on the ADA claim and did not discuss the Medicaid Act. 357
26   F.3d 988 (9th Cir. 2004). In *J.K. ex rel. R.K. v. Dillenberg*, 836 F. Supp. 694 (D. Az. 1993) the
     defendants were *state* officials. The Court rejected the argument that the Medicare Act's
27   requirement to provide notice of termination of services only applied to the state and not to an
     alleged independent contractor that the state delegated its Medicaid responsibilities to. Therefore,
28   the plaintiffs were entitled to a declaration that the actions taken by the contractor were effected
     on behalf of the state. This case is inapposite on its facts.

### 2.   District Liability

Nor can there be liability for the District under § 1396a(a)(8).  Plaintiffs' reliance on *J.K. ex rel. R.K. v. Dillenberg*, is misplaced.  The court in *Dillenberg* did not decide that the contractor providing Medicaid services on behalf of Arizona could be held liable for Medicaid violations, but only that the actions taken by the contractor could be considered state action by the *state* defendants.  *Dillenberg*, 836 F. Supp. at 699.

On the record before me, plaintiffs have not shown a likelihood of success on the merits or that serious questions go to the merits of their claims under the Medicaid Act.

### H.   California Welfare & Institutions Code § 17000

Under § 17000, a county "shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."  This provision has been held to require a county to provide hospital and medical services to indigent residents.  *Bd. of Supervisors v. Superior Court*, 207 Cal. App. 3d 552, 557 (Cal. Ct. App. 1989).  Plaintiffs contend that by reducing services, or allowing them to be reduced, at DMC defendants have violated their duties under § 17000.

### 1.   County Liability

The County argues that it fulfills its duties under § 17000 by providing comprehensive health care services through its RMC and at licensed clinics throughout the County.  The County also supplements the services it provides directly by purchasing specialized medical services.  Declaration of William Walker [Docket No. 36], ¶ 22.  The County recognized that under both its "Basic Health Care Plan" and CCHP, participants could receive pre-authorized and emergency services at DMC.  But if DMC reduces its services or closes, "prior authorized non-emergency care and emergency care would be provided at many other locations in the region, including Alta Bates Hospital in Berkeley, Summit Medical Center in Oakland, CCRMC in Martinez, and other hospitals as needed, including UCSF and UC Davis for more specialized services."  *Id*. ¶ 23.

While the County may have justified providing financial support to DMC in the past because DMC was a critical part of the County's Emergency Medical Services System and in light

United States District Court
Northern District of California

22

United States District Court
Northern District of California

of its obligations under § 17200 (*see, e.g,.* Godley Decl., Ex. 1 pg. 1 ¶ C; County RJN at Ex. O), the fact that DMC has reduced services and may close does not mean that the County is failing in its obligations under § 17000.  It is true that the County in the EMS' Impact Evaluation Report found that patients will face increased morbidity and mortality if DMC was not able to provide emergency services (Compl., Ex. 1), but that does not mean that DMC was necessary for the County to meet its obligations under § 17000.  Here, the County has a fully functioning critical care hospital and a network of community clinics to provide indigent care.  While the reduction of services at DMC will force indigent residents to travel farther for their care, that does not – on this record – mean that the County is failing to satisfy its obligations under section 17000.

On the record before me, plaintiffs have not shown a likelihood of success on the merits or that serious questions go to the merits of their § 17000 claim.  It bears repeating that this is an early determination made only on the evidence that the parties have had the time to gather to this point.  I am not foreclosing the possibility that plaintiffs will find additional, stronger, and more probative evidence to support their claim that in light of current or further reductions of services at DMC, the County is failing to meet its duties under § 17000.

### 2.  District Liability

Plaintiffs have not shown that the District can be held liable for a breach of the County's duties under § 17000, which imposes a standard of care on *counties*, not health care providers or districts.

## I.  California Health & Safety Code § 1255.1(a).

Under § 1255.1(a), "[a]ny hospital that provides emergency medical services under Section 1255 shall, as soon as possible, but not later than 90 days prior to a planned reduction or elimination of the level of emergency medical services, provide notice of the intended change to the state department, the local government entity in charge of the provision of health services, and all health care service plans or other entities under contract with the hospital to provide services to enrollees of the plan or other entity."

### 1.  County Liability

By the terms of this section, the County has no role in providing notice and cannot be held

23

1    liable for the District's alleged failure to do so.  The County points out that in response to the

2    April 15, 2014 notice it received from DMC regarding closure, it held a public hearing and

3    prepared an Impact Evaluation Report, as required by Health & Safety Code § 1300.  Plaintiffs do

4    not dispute that the County fulfilled its obligations under § 1300.

5    **2.  District Liability**

6    The District argues it complied with the notice requirement on April 15, 2014, when it sent

7    a letter to County EMS, and on April 22, 2014, when it sent a letter to the Inez Robinson of the

8    California Department of Public Health ("CDPH") notifying them of its intent to cease emergency

9    services July 25, 2015.  Gideon Decl., ¶ 7 & Ex. 1.  Gideon states that even though the date of

10   closure changed in response to various circumstances, the District did not rescind the notice.  *Id.*

11   Plaintiffs point to Ms. Gideon's June 10, 2014 letter to Inez Robinson where Gideon

12   informed Robinson that DMC was exploring options that would allow it to continue to provide

13   emergency medical services, and as such, the Directors of the District "will not proceed at this

14   time with a vote to close DMC effective July 25, 2014.  Accordingly, this letter serves to rescind

15   our April 22, 2014 closure notification."  Compl., Ex. 1 [Docket No. 1-4 at pg. 5 of 42].

16   Plaintiffs contend that the June 10, 2014 letter effectively rescinded the notice to the state.

17   In her declaration, Gideon does not address her June 10 letter to Robinson.  Instead, she

18   states that the District "has since notified CDPH and the public that the July 25,2014 closure date

19   was changing," but provides not details on when or how that notice occurred.   At the hearing,

20   however, the District pointed out that the June 10, 2014 letter did not say it was rescinding notice

21   of its intent to close its *emergency department*, but only that the Board did not intend to vote to

22   close the *hospital*.  The District is correct that the narrow language in the June 10 letter says that

23   the Board did not intend to "vote to close DMC," and the April 22 letter referred to both the

24   potential closure of DMC as a whole, as well as the potential closure of the Emergency

25   Department at DMC.  The Court, therefore, cannot find on this record that the June 10, 2014 letter

26   was an unambiguous rescission of the April 22nd notice of closure of the ED.

27   But even if the District did not comply with § 1255.1(a)'s notice requirements, it is

28   unlikely that the District can be liable to plaintiffs because there is no evidence that the state

United States District Court
Northern District of California

24

intended to give members of the public a private right of action to enforce it.  Under California law, a "statute creates a private right of action only if the statutory language or legislative history affirmatively indicates such an intent . . . . That intent need not necessarily be expressed explicitly, but if not it must be strongly implied." *Farmers Ins. Exchange v. Superior Court*, 137 Cal. App. 4th 842, 850 (Cal. App. 2006) (citations omitted).

There is no evidence from the language of the statute (and neither party has submitted legislative history) that the legislature intended to create a private right of action for members of the public under § 1255.1(a), which as noted above, requires hospitals to notify state and local governments, as well as affected health care plans.  Plaintiffs do not respond to this issue in their Reply or otherwise provide support for their ability to bring a private right of action under § 1225.1(a), because no notice was "provided to the local government entity."  Reply at 13.

On the record before me, plaintiffs have not shown a likelihood of success on the merits or that serious questions go to the merits of their § 1225.1 claim.

Reviewing all of the legal claims asserted by plaintiffs, I cannot find that they have shown a likelihood of success or that serious questions go to the merits of their claims on the record before me.  As noted above, this does not mean that plaintiffs are prevented from attempting to build that record through discovery.  I am not making a final determination on the strengths of plaintiffs' claims.  But on this record, and in light of the legal claims asserted, plaintiffs have not shown that the facts and law "clearly favor" them to justify me taking the extraordinary and disfavored step of issuing a mandatory injunction forcing DMC to resume receiving ambulances, reopen the STEMI unit, and expand the number of inpatient beds.  *Stanley v. University of S. Cal*., 13 F.3d at 1320.

## II.  IRREPARABLE INJURY/BALANCE OF HARDSHIPS

Even though plaintiffs have failed to meet the burden on their legal claims and, as a result, an injunction cannot issue, I will briefly address the remaining injunction factors.  Plaintiffs argue that irreparable injury has been amply demonstrated by focusing on the delays and overcrowding being experienced by the regional EDs, the burden of travelling farther on the West County

United States District Court
Northern District of California

United States District Court
Northern District of California

1   residents, and the increased risk of morbidity and mortality that can result from increased travel

2   distances and delayed treatment.  I agree that a significant injury is occurring.  But it does not

3   appear that the injury has been caused by defendants or that it would necessarily be avoided if I

4   issue the mandatory injunction plaintiffs seek.

5       The harms have been caused by the precarious financial condition of the District and the

6   rejection of Measure C by voters in May 2014.  The District argues that despite its staffing and

7   long-term financial situation, it is attempting to continue operations at DMC in as safe a way as

8   possible and provide the greatest amount of services possible until its funds run out.  While

9   plaintiffs may dispute the order in which services have been reduced, a reduction – either now or

10  in the very near future – is inevitable unless significant, additional funds are secured. There is

11  nothing in the record before me to suggest that there is a likelihood that will happen.  Plaintiffs

12  may, in discovery, adduce evidence showing that the reduction in services was unnecessarily

13  expedited or was not in fact necessary because of staffing or finances, but that evidence has not

14  been presented to me on this motion.

15      In addition, if I was to order DMC to resume its services I would have serious concerns

16  about the ability of DMC to operate safely and within the staffing requirements imposed by

17  CDPH.  While plaintiffs have shown that some former nurses were willing (as of mid-July) to

18  work per diem, there is *no evidence* that a sufficient number of ED/STEMI nurses *and* doctors can

19  be obtained to operate the ED or the STEMI unit (or the inpatient beds) safely.

20      Irreparable injury and the balance of hardships, therefore, do not weigh in favor of granting

21  plaintiffs' mandatory injunction.

22  **III. PUBLIC INTEREST**

23      As with the harm and balance of hardships, the mandatory injunction plaintiffs seek – to

24  force DMC to resume the level of service as existed prior to the diversion of ambulances, closure

25  of the STEMI, and reduction in inpatient beds – is not necessarily in the public interest.  DMC has

26  limited and dwindling funds.  Even if the emergency legislation pending in Sacramento passed,

27  that would only add $3 million to DMC's operating funds.  And there is no any evidence of any

28  likelihood that Kaiser, John Muir, or other regional hospitals will provide further financial support

1   to DMC.

2         In this circumstance, forcing DMC to reopen its closed services – *assuming* it could do so

3   safely with a combination of full-time and per diem/registry staff to satisfy the state regulators, an

4   unsupported assumption –would leave *less* money for the District's efforts to allow DMC to

5   continue to operate on a more limited basis in the short-term.  It would also hamper the District

6   long-term goal to reorganize DMC as a "different sort of healthcare provider" so that it can

7   continue to provide services to West County residents in the future.  Zell Decl. ¶ 28.

8         While there is no doubt that the reduction of services of DMC is having a real adverse

9   impact on West County residents, it appears to me that the mandatory injunction plaintiffs seek

10  would hasten the full closure of DMC and jeopardize the ability of DMC to serve West County

11  residents in the future.  The public interest, therefore, does not weigh in favor of granting the

12  mandatory injunction sought by plaintiffs.

### IV. LEAVE TO AMEND

14        In a declaration submitted with the Reply, plaintiffs ask the Court to give them an

15  opportunity to file a First Amended Complaint with an additional cause of action under the Knox-

16  Keene Act, additional defendants (the State and state officials), and additional facts regarding the

17  defendants.  Docket No. 51.  Plaintiffs are allowed to e-file their proposed FAC as of right under

18  Federal Rule of Civil Procedure 15(a)(1), and should do so.[16]

19  <div align="center">**CONCLUSION**</div>

20        For, the reasons described above, the motion for a preliminary injunction is DENIED.

21  However, given the importance of this problem and fluidity of the situation, I will require the

22  District to provide a status report concerning the services it is providing and any future plans for

23  the use of DMC on October 1, 2014.  The County shall also file a status report on that date that

24  describes how it is addressing the loss of services for West County residents caused by the

25

26

27  ---

    [16]  At the hearing on the motion for a preliminary injunction, plaintiffs did not discuss their
28  proposed additions in the FAC or argue that the additional cause of action, defendants, or facts
    made a material difference to their motion for a preliminary injunction.

United States District Court
Northern District of California

1    reduction of services at DMC.

2         **IT IS SO ORDERED**.

3    Dated:  August 29, 2014



4    _____

5    WILLIAM H. ORRICK
     United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California